THE UNITED STATES, PLAINTIFFS IN ERROR, *v.* JOHN FITZ-
GERALD AND HIPOLITE FITZGERALD, DEFENDANTS IN ERROR.

John Fitzgerald had been appointed, in 1833, Inspector of the Customs for the District
of Mississippi; and by the Collector at New Orleans, he had been employed as board-
ing officer at the south-west pass on the Mississippi river, and went into possession
of a tract of land which had been occupied by a former boarding officer in the service
of the United States. The Collector was not instructed by the Treasury Depart-
ment to place the boarding officer on that, or any other tract of land; nor was he
bound to reside there. The United States had provided no accommodations for
the boarding officer. The Collector had never, before possession was so taken,
requested that the land should be reserved for the use of the boarding officer, or of the
custom house at New Orleans. John Fitzgerald, on the 18th June, 1836, entered the
tract of land with the Register of the Land Office in New Orleans, and he and Hipo-
lite Fitzgerald, his wife, expended their own money on the improvements of the tract,
and complied with all the requisitions of the laws of the United States granting pre-
emption rights. Proof was made, before the R gister of the Land Office, of the
possession and cultivation of the tract of land in 1833; and the purchase money was
paid to the United States. The acting Commissioner of the Land Office, on the
3d November, 1836, wrote to the Register of the Land Office at New Orleans,
stating that the Secretary of the Treasury had directed that the land should be
reserved from sale for the use of the custom house at New Orleans, and requesting
that it should be marked as reserved from sale on the plats of land in his office. The
Circuit Court of Louisiana dismissed the petition which had been presented by the
United States, claiming this land, and decreed that John and Hipolite Fitzgerald
should be quieted in the possession of the land; and on appeal to the Supreme Court
the decision of the Circuit Court was affirmed.

No law is known to exist which deprives an officer in the service of the United States
of a right to acquire a portion of the public lands, by any mode of purchase com-
mon to other citizens.

If a tract of land has been severed from the public domain, by a legal appropriation of
it for any public purpose, no right can be acquired to it by cultivation or possession;
because the land thus severed is not subject to the pre-emption law.

It cannot be pretended that the land held by John and Hipolite Fitzgerald was reserved
from sale, by an act of Congress, or by order of the President. The direction of the
Secretary of the Treasury, to reserve it from sale, several months after it had been
sold and paid for, would not amount to such a reservation.

No appropriation of public land can be made for any purpose, but by authority of an
act of Congress. By the 3d section of the Constitution of the United States, power
is given to Congress to dispose of and make all needful rules and regulations respect-
ing the territory or other property of the United States. No authority is known to
exist in any Collector, under a law of Congress, to make an appropriation of land
for the use of the United States.

[The United States *v.* Fitzgerald.]

If an act of Congress had directed a lighthouse to be erected on the tract of land held
    by John and Hipolite Fitzgerald, before they had entered it, according to the decision
    of this Court in the case of Wilcox *v.* Jackson, 13 Peters, 498, this would have
    been an appropriation of the tract to the use of the United States, within the
    meaning of the act of Congress of 29th of May, 1830; and would have taken
    away the right of pre-emption.

IN error to the Circuit Court of the United States for East
Louisiana.

The United States, by a petitory action in the Circuit Court
of Louisiana, claimed a tract of land, situated in the parish of
Plaquemine, on the river Mississippi, below the port of New
Orleans.

This land, one hundred and sixty acres, had been entered by
the defendants in error, under a pre-emption right alleged to be
founded on the possession and cultivation of the tract, com-
mencing in 1833. The entry had been regularly made in the
office of the Register of Public Lands, in Louisiana, under the
act of Congress of 1834, on the 18th of June, 1836, and the pur-
chase money paid to the United States. John Fitzgerald, on the
6th of May, 1833, had been appointed an Inspector of the
Customs for the port of New Orleans, and was despatched by
the Collector of that port to the south-west pass of the Mississippi
river, in order to discharge the duties of boarding officer. He
was stationed at a proper point on the river, and himself and
his wife took possession of a house which had been occupied by
a former boarding officer, on the public lands of the United States.
The government had provided no place for the residence of the
boarding officer. The land was cultivated and improved by
John Fitzgerald and Hipolite Fitzgerald, his wife, in the manner
which, by the laws of the United States, gave them a pre-
emption right to the same; unless there had been a previous
appropriation, by the United States, of the tract for public
purposes.

Some months after the entry of the land and the payment of
the purchase money, the Secretary of the Treasury, through the
acting Commissioner of Public Lands, directed the tract to be
reserved from sale for the use of the United States.

The United States proceeded, by this action, in the Circuit Court,

to establish their right to the land; alleging that Fitzgerald and his wife had acquired no right or title to the land, but that the same continued a part of the public lands of the United States. They averred that the possession which had been taken of the land by John Fitzgerald and his wife, had been for the use of the United States; John Fitzgerald being at the time an officer in the service of the United States.

The Circuit Court ordered the petition of the United States to be dismissed: and decreed that the defendants in error should be confirmed in their title to the land.

The United States prosecuted this writ of error.

The case was argued by Mr. Gilpin, Attorney General, for the United States; and by Mr. Bell, for the defendants in error.

Mr. Gilpin, for the United States.

The mouth of the Mississippi river consists, as is well known, of five outlets or " passes," as they are called, which run through the narrow banks or tongues of alluvial land that stretch into the Gulf of Mexico. The principal of these, the south-west pass, extends for almost fifteen miles into the ocean, having on each side a narrow margin, chiefly of swamp. In some places this bank between the river and the ocean, is not more than three or four hundred yards in width. In other places it has greater breadth. On this narrow strip, on the west side of the river, a short distance above the Balize, or extreme mouth of the Mississippi, is a spot which afforded a small space sufficiently protected to enable the boarding officer attached to the custom house at New Orleans, to have a sort of land station. It was so occupied, as is in evidence in this cause, as early as the year 1830; and by common repute, and without doubt, it had been so occupied long before. On the 2d of March, 1829, Congress, by law, directed a survey of the passes of the Mississippi, with a view to the improvement of their navigation, and the building of lighthouses, (8 Laws U. S. 202;) and on the 3d of March, 1831, they passed an act appropriating forty thousand dollars for building a lighthouse on the south-west pass, and another near the Balize. The boarding station at the former place may be regarded as being, in the contemplation of Congress, the spot

for the former, it being, as the evidence in this case states, the only spot in that region where such a station could be made. In the year 1833, four years after the survey, and two years after the appropriation for building the lighthouse, the Collector of the customs at New Orleans, employed the defendant, John Fitzgerald, as an Inspector, and stationed him as the boarding officer, in the cruising vessel at the south-west pass. He was allowed to be occasionally on shore at a convenient place on the pass, and the spot in question had always been used for that purpose. There was a house there; but by whom originally built does not appear. There is no evidence of its being built by the United States, nor any of its erection by the defendant. The Collector says, that finding this place "so used by the boarding officer, he continued him there without any special instruction from the President, or the Secretary of the Treasury."

On the 6th of March, 1834, the legislature of Louisiana passed a law, ceding the civil and criminal jurisdiction over the land to the United States.

On the 29th May, 1830, an act of Congress was passed, (4 Story's Laws, 2213,) to grant pre-emption rights to settlers on the public lands. The provisions of that act were, that every "settler or occupant" of the public lands, who was then in possession, and had cultivated it in the year 1829, might enter at the land office not more than one hundred and sixty acres, to include his improvement, at the minimum price. If there were two or more persons settled on the same quarter section, it might be divided between them, and each enter eighty acres elsewhere. Before entry under the act, proof of settlement or improvement was to be made to the Register and Receiver, agreeably to the rules prescribed by the General Land Office. No entry was to be made under the act of any land which was either "reserved for the use of the United States, or either of the several states, or reserved from sale by act of Congress, or by order of the President, or which might have been appropriated for any purpose whatever." This law was to expire in one year from its date. On the 10th June, 1830, and the 14th September, 1830, full rules were prescribed by the Commissioners of the General Land Office relative to the execution of this law, directing the precautions to be taken in regard to proof of occupancy and

cultivation, what was the meaning of those terms, and requiring actual payment. 2 Birchard's Land Laws, 539. 545. On the 10th June, 1834, an act was passed to revive the pre-emption act of 1830, which gave, for two years from its passage, all the privileges of that act to every settler or occupant of the public lands who was then in possession, and had cultivated any part thereof, in the year 1833. On the 22d of July, 1834, full rules were issued by the Commissioner of the General Land Office, (2 Birchard's Land Laws, 589,) as the law required, and directions were given as to the nature and mode of proof by which the pre-emptor's right was to be ascertained. On the 29th February, 1836, additional rules (2 Birchard's Land Laws, 624) on the same subject were issued, as the period at which this privilege was about expiring approached; in this, the regulations as to proof were more fully set forth, especially in the cases where floating rights were claimed by an alleged settlement of more than one person. On the 2d June, 1836, John Fitzgerald and Hipolite Fitzgerald his wife, made an affidavit before W. B. G. Taylor, a justice of the peace in the parish of Plaquemines, annexed to an application to the Register and Receiver at New Orleans to become the purchasers of one hundred and sixty acres of land, being section 8, of township 24, range 30 east, under the provisions of the act of 19th June, 1834, and stated that they had cultivated the same and were in actual possession and occupancy thereof at the date of the law. On the 3d June, the day after, a deposition was made by two persons before the same justice, stating, generally, that the facts set forth in the application of Fitzgerald and his wife were true. On the 18th of June, the day on which the act expired, an application for a float for one hundred and sixty acres in addition, appears to have been made, but is not signed by either Fitzgerald or his wife. On the same day is a certificate signed by the Register at New Orleans. stating, " that the foregoing lots contain three hundred and twenty-seven acres and a half, as stated in the foregoing application, according to the returns of the Surveyor General, and that the price agreed upon is one dollar and twenty-five cents an acre." On the 3d of November, 1836, a letter was addressed to the Register, by the Commissioner of the General Land Office, stating that the application of " John Walker" to enter section 8,

township 24, range 30 east, had been received from him, but that the Secretary of the Treasury has directed it to be reserved from sale, as important for the use of the Custom House, and he directs him to apprize Mr. Walker, and Messrs. John and Hipolite Fitzgerald that no entry, whatever, can be permitted. Fitzgerald, however, subsequent to the termination of his office as an inspector, continued to assert his right to the property as pre-emptor, which had become valuable from the lighthouse being erected upon it; and, on the 5th of January, 1837, a petition was filed, by the District Attorney, in the Circuit Court of the United States in Louisiana, setting forth this claim, denying its legality, and praying that they should be adjudged to deliver up possession of the land to the United States. On the 20th February, 1837, the defendants filed their answer, in which John Fitzgerald admitted that he was boarding officer at the southwest pass, and stated that he was under the necessity of " procuring accomodations" there, the same not being furnished by the United States; and that he was entitled to the benefits of the pre-emption law; they, therefore, prayed that the suit might be dismissed, and all other relief granted that the nature of the case might require. On the 28th December, 1839, the Circuit Court, the District Judge alone sitting, gave judgment " that the defendants be quieted in their possession of the premises in dispute, and that the plaintiffs take nothing by their petition." On the 21st April, 1840, a writ of error was issued from this Court.

It is submitted that this judgment was erroneous; because

1. A decree to quiet the possession of the defendant, was not one which the Court could properly render in this suit against the United States.

2. The defendant could not, at the time this suit was brought, claim the benefits of a pre-emptor in the land mentioned in the declaration.

3. The land mentioned in the declaration was not subject to entry, under the act of 19th June, 1834.

I. A decree to quiet defendants' possession, is not one that the Court ought to have made. It is given as a mere interlocutory proceeding, while a suit to try the right of possession is pending, (2 Story's Equity, 161;) but, in this case, it is a final decree, barring the plaintiff's right. York v. Pilkington, 1 Atkyns, 284.

East India Company *v.* Sandys, 1 Vernon, 129, and note. ·Anonymous, 2 Vesey, Sen. 414. Belknap *v.* Belknap, 2 John. C. C. 472. Nor was such a decree asked for by the defendants. The United States claimed the land; the defendants were in possession; the United States were to establish their title; if good, to get possession; if bad, to be refused it, and dismissed. What necessity was there for the Court to give any other judgment? It was totally uncalled for; and, if given in accordance with any peculiar practice of Louisiana, let that be shown. Such would not seem to be the case, judging from the decision of the Supreme Court of that state, in the case of Cullivec *v.* Garick, 11 Louis. Rep. 89. Unless sustained by such local practice, the precedent is a dangerous one. In ejectment, the plaintiff relies on his own title. He is prepared only to examine and present that. If he fails to make it good, his suit is lost. If the Court, passing beyond this, decides upon the defendants' title, they decide a point not necessarily before them, and which the plaintiff was not warned would be presented, or prepared to meet.

If, however, the defendants' title was properly before the Court, on what ground could it adjudge that they were entitled to possession? Under what right were they? It is admitted that they had no legal title; that remained in the United States. At the most, they could have had nothing more than an equitable claim to a title; and they had not, in fact, even that. If they had a Register's certificate in due form, it gave them no title; it proved merely a few facts, necessary, indeed, to their procuring a title, but by no means sufficient or conclusive. But, by this judgment, they obtain, on such a ground, an absolute and complete title. They have a decree of a Court, awarding to them a possession that nothing is to disturb. This, too, they obtain against those who have, and never have parted with, the actual fee. A patent could give them no more. This decree, therefore, to "quiet the defendants' possession," is a title equivalent to a patent, against the owner who still holds the patent; for the United States, never having issued it, are as fully the holders of it as their grantees could be. Now when has it been heard that a Register's certificate is to prevail against a patent? The acts of Congress, from the beginning of the government, recognise a patent as the complete evidence of title to the public domain;

and nothing else. 1 Story's Laws, 424. 787. 818. 2 Story's Laws, 896. 1022. 1067. 1201. 1239. 1417. The holder of an unpatented location cannot dispossess him who holds under a patent; much less can he dispossess the United States, who have never issued a patent. Terret v. Taylor, 9 Cranch, 43. Polk v. Wendell, 9 Cranch, 87. Russell v. Transylvania University, 1 Wheaton, 432. M'Clung v. Silliman, 6 Wheaton, 605. Ross v. Doe, 1 Peters, 664. Bagnell v. Broderick, 13 Peters, 450. Jackson v. Wilcox, 13 Peters, 517. Ritchie v. Woods, 1 Wash. C. C. R. 11. Depassau v. Winter, 7 Louis. R. 6. Boatner v. Ventris, 8 New Series, 653. It was never the intention of the law, from which alone these certificates gain any force, that they should take the place of patents. They are inferior evidence. They establish certain facts; they do not confer title. Could the District Judge change their character? Could he make them what the law never intended them to be? He should have dismissed the plaintiffs' application, if he deemed the evidence insufficient to sustain it; but he had no right to decree the sufficiency of the defendant's title. In this there was error.

II. The defendant, Fitzgerald, could not, at the time the suit was brought, establish any possessory title under the pre-emption law of 1834. He had neither done what was necessary to entitle him to its privileges, nor had he, in fact, received from any authorized officer, any legal recognition to that effect. He was not a settler; he had made no improvement or cultivation; he had offered no proof satisfactory to the Register and Receiver; he had made no entry; and he had received no certificate. A settler is a person who takes possession, for the purposes of cultivation; who personally occupies the land, and makes it his home, not occupying it for a cause merely temporary; he must use it for farming purposes. In the case of Henderson v. Poindexter, 12 Wheaton, 530, this Court considered settlement as meaning an actual bona fide residence. Now the evidence in this case shows that the settlement of Fitzgerald bore no resemblance, whatever, to such occupation. Even if he cultivated this remote, inhospitable strip of land, jutting into the ocean, it was done with no such intention on his part. He went there from necessity, as a public officer, for a public purpose. He did not go even voluntarily; he was sent there. Can a public officer, sent for a

public object, on to a part of the public domain, be considered as a settler? Could a body of troops, stationed through the winter on. public land near the frontiers, acquire the pre-emption rights of settlers? Do the commanders of temporary posts acquire all those rights? Fitzgerald admits that he went to this place as the boarding officer; that he took possession as such; that he occupied the cabin as such. · The Collector proves that, in such capacity, he allowed such occupation. If this gives a pre-emption right, there is no occupation of public soil, for public purposes, by an officer sent upon them, that will not give it.

Nor did Fitzgerald make any improvement. The house was there when he was sent to the station; and it is evident that, so far from seeking to improve it, he used it merely as a temporary residence, in the intervals of his duty as the boarding officer.

But it is not sufficient that these things were done, had that been the case. They must have been proved, within the time limited by law, "to the satisfaction of the Register and Receiver," agreeably to the established rules. Now of this having been done, there is not the slightest evidence. The signature of the Register does not appear to a single paper to that effect; that of the Receiver is not affixed to any other document than a mere receipt for money paid. Surely the examination by these officers, of the facts on which so great a privilege rests, as that which the law accords to pre-emptors, is not to be thus lightly dispensed with. 2 Birchard's Land Laws, 589. Nor does this defect stop here. So far as the record enables us to discover, Fitzgerald never made any entry at all. There is evidence of an application to enter; but there the record stops. There is no certificate of its having been made or allowed. The document, which, in the case of Jackson *v.* Wilcox, 13 Peters, 505, showed so fully a compliance with all the necessary forms, is here totally wanting.

It is unnecessary to comment upon another fact connected with this pre-emption claim: that is, the right to a float derived from an alleged separate settlement by Fitzgerald's own wife; because the present decree of the Court does not extend to the entry under that claim.

III. But suppose that the defendant's right to a pre-emption, was not affected, for any of the reasons stated; could it be

located on this tract of land? The terms of the law are very broad; they positively exclude, from any such location, all land reserved for the use of the United States; or reserved from sale by any act of Congress; or appropriated for any public purpose. 4 Story's Laws, 2213. Now what appropriation for a public purpose can be more complete than this very act of Fitzgerald's. He is sent to the land by the Collector, for a public purpose; necessarily occupies it for that purpose. Is not this an appropriation? In fact, the whole evidence shows that for years and years before it had been so used; so appropriated. The testimony of the Collector at New Orleans is positive upon this point. The language of this Court, in the case of Jackson v. Wilcox, 13 Peters, 511, 512, shows that, wherever there is a real and permanent use of a part of the public domain for a public purpose, it is such an appropriation of it as the law intended. It is quite apparent, from the words of the act, that they were inserted for the express purpose of protecting from pre-emption settlements, such spots on the public domain as the public convenience had made it necessary from time to time to use; and which, as all the land belonged to the United States, operated injuriously to no one. The act reserved from pre-emption, in express terms, every tract that had been set apart for the use of the United States, either by the President, (of course embracing the acts of the executive departments, under his actual or implied direction,) or by act of Congress. It then proceeded to reserve an additional class, that is, such spots as were then actually appropriated, or used for a public purpose. Of course, the positive reservation by the executive, or by law, was not necessary in the latter class of cases. This was meant to refer to cases of actual appropriation; not arising from definite and specific acts, as distinguished from reservations made by the former.

But, in fact, there does appear to have been an express reser vation of this piece of ground, by the Secretary of the Treasury. As soon as information reached the General Land Office, of Fitzgerald's application, the Register was informed that " the Secretary of the Treasury had directed that tract of land to be reserved from sale, as it was important for the use of the custom house, at New Orleans." This language has evident reference, not to a reservation then first made, but to one that had been

previously made, for a well ascertained object, of which the importance was fully recognised and already known. The lighthouse, too, though on an island separated by a narrow channel from the particular spot where the cabin occupied by Fitzgerald stood, was, in fact, to be regarded as a part of the same premises. It was all a piece of land embracing a few acres in a narrow circuit, stretching into the ocean, where alone these public objects connected with commerce could be attained. These acts, if not reservations within the express terms of the act of Congress, are yet clearly such as are held to be sufficient, under the opinion of this Court, in the case of Jackson *v.* Wilcox, 13 Peters, 498.

On the whole, therefore, it is submitted that the Court below, erred, in giving, by its decree, an absolute title to the defendant, instead of merely dismissing the plaintiff's bill; and that, on the merits, the defendants had shown neither a sufficient title under the pre-emption law, nor a right to locate it upon the land they claimed.

Mr. Bell, for the defendants in error, contended that the land in controversy was, in 1833, part of the public land of the United States, and was subject to entry and sale, under pre-emption rights. When John Fitzgerald went to the land, and took possession of the building upon it, he did so for his own personal accommodation, and not for the use of the United States; while it was certainly the province, in all justice, of the government, to provide a residence for the boarding officer; at a place most convenient for the performance of his duty; yet, having failed to do so, it became necessary for him to procure one for himself. In this he did not act for the government; he had no authority to act for them; and all he did, was at his own private cost, and enured to his own personal benefit.

May not a public officer purchase public lands for his individual account? May he not cultivate and improve public land, and entitle himself to the privileges and rights of a pre-emptor? The questions can receive but one answer: although an officer in the service of the United States, no exclusion from such rights exists by law. He enjoys them in common with every citizen of the United States.

In fact, no appropriation of this land for public purposes, has ever been made. Although the directions of the Secretary of the Treasury to reserve this land from sale, were given after the defendants in error had acquired a full title to the land; yet, if they had not acquired such title, the public lands cannot be appropriated to the use of the United States, by any act of the Secretary of the Treasury, unless specially thereto authorized by law.

The public lands are, by the Constitution, placed in the hands of Congress; and an act of Congress is required to authorize any and every severance of any part of them from the great body of the public domain, for the special use of the government. While the President of the United States is authorized, in particular cases, to appropriate portions of the land, for the purpose and use of the government, no such right or privilege is given to the head of the Treasury Department.

Mr. Justice M‘Kinley delivered the opinion of the Court.

This is a petitory action brought by the plaintiffs, in the Circuit Court of the United States for the Eastern District of Louisiana, to recover one hundred and sixty acres of land, claimed by the defendants under the pre-emption law of the 19th of June, 1834. In their petition the plaintiffs allege, that the defendants, under the pretence that they were entitled to section number 8, containing one hundred and sixty acres in township 24 of range 30, by right of pre-emption, on the 18th day of June, 1836, entered it with the Register of the Land Office at New Orleans; that the defendant, John Fitzgerald, took possession of the land as an officer of the customs, by direction of the Collector at New Orleans, and not as a settler; and that the land had, long previous to the entry, been appropriated for public purposes, and attached to the custom house at New Orleans.

The defendants admit in their answer, that John Fitzgerald was an officer of the customs, and discharged the duties of boarding officer at the south-west pass; where, finding no accommodations or dwelling provided for them by the United States, they were under the necessity of procuring one for themselves, in which they expended their own money. That having complied with all the requisitions of the laws of the United

States granting pre-emption rights, they entered the said tract of land; and insist that, by the laws of the United States, they are entitled to it.

It was proved on the trial that the defendant, John Fitzgerald, had been appointed, by the Secretary of the Treasury, Inspector of Customs for the District of Mississippi; and, by the Collector at New Orleans, he had been appointed boarding officer, at south-west pass, on the Mississippi river, and put into possession of the tract of land in controversy, which had been occupied by former boarding officers. The Collector was not instructed, by the Treasury Department, to place the boarding officer on that tract of land, nor was he bound to reside there; but might reside at any other place, convenient for the discharge of his duties. The Collector had never requested that this land should be reserved for the use of the boarding officer. A letter from the acting Commissioner of the General Land Office, dated the 3d of November, 1836, directed to the Register of the Land Office, at New Orleans, stating that the Secretary of the Treasury had directed that this tract of land should be reserved from sale, for the use of the custom house at New Orleans, and requesting the Register to note upon his plats that it was so reserved from sale, and to give notice of the fact to the defendants, was also read as evidence.

The defendants proved that they had made proof of their possession and cultivation of the tract of land in controversy before the Register and Receiver, according to law, and had entered it with the Register and paid the purchase money. Whereupon the Court below, according to the usual form of rendering judgment in such cases in Louisiana, decreed that the defendants be quieted in their possession of the premises in dispute, and that the plaintiffs take nothing by their petition.

To reverse this judgment, the United States have prosecuted this writ of error. Two objections have been taken to the judgment.

1. The defendant, John Fitzgerald, being in the service of the United States while residing on the public land, could not by cultivation and possession acquire a right of pre-emption; and if he could, this land was not subject to pre-emption, it having been appropriated to public use.

2. The Court had no power to quiet the defendants in their possession of the premises in dispute, the fee in the land being in the United States.

No law has been produced to show that an officer of the United States is deprived of the benefit of the pre-emption laws; nor do we know of any law which deprives him of the right to acquire a portion of the public land, by any mode of purchase common to other citizens. Had this tract of land been severed from the public domain by a legal appropriation of it, for any public purpose, Fitzgerald could have acquired no right to it by cultivation and possession; not because he was an officer of the United States, but because the land would not have been subject to the pre-emption law.

Was this land so appropriated? The pre-emption law of the 19th of May, 1830, which was revived by the act of the 19th of June, 1834, declares that the right of pre-emption shall not extend to any land which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatever. 4 Story's Laws United States, 2213. The first section of the act of the 19th of June, 1834, gives to every settler or occupant of the public lands, prior to the passage of that act, who was then in possession and cultivated any part thereof in the year 1833, all the benefits and privileges provided by the act, entitled an act to grant pre-emption rights to settlers on the public lands, approved the 29th of May, 1830, and which act was thereby revived. The reservation and appropriation mentioned in the act of the 29th of May, 1830, must have been valid and subsisting at the date of the act of the 19th of June, 1834, to deprive the defendants of their right of pre-emption.

It cannot be pretended that the land in controversy was reserved from sale by any act of Congress, or by order of the President, unless the direction of the Secretary of the Treasury to reserve it from sale, several months after it had been actually sold and paid for, could amount to such an order. As no reservation or appropriation of the land made after the right of the defendants accrued under the act of the 19th of June, 1834, could defeat that right, it is useless to inquire into the authority by which the Secretary of the Treasury attempted to make the reservation.

The remaining question, under the first objection is, whether there had been any appropriation of this land for any purpose whatever, prior to the passage of the act, of the 19th of June, 1834. No appropriation of public land can be made for any purpose, but by authority of Congress. By the third section of the fourth article of the Constitution of the United States, power is given to Congress to dispose of and make all needful rules and regulations respecting the territory, or other property belonging to the United States. As no such authority has been shown to authorize the collector at New Orleans to appropriate this land to any use whatever, it is wholly useless to inquire whether his acts, if they had been authorized by law, would have amounted to an appropriation.

But it has been contended, in argument, that the act of the 3d of March, 1831, authorizing the erection of a lighthouse at the mouth of the south-west pass, was an appropriation of this land for that purpose. By the plat, found in the record, it appears that there are between forty and fifty tracts of land, containing one hundred and sixty acres each, including the tract in controversy, all fronting on the south-west pass. If the act had directed that the lighthouse should be built on this particular tract, according to the decision of this Court in the case of Wilcox *v.* Jackson, 13 Peters, 498, it would have been such an appropriation within the meaning of the act of the 29th of May, 1830, as would have deprived the defendants of their right of pre-emption. But the same plat shows that the lighthouse was built on Wagoner's Island, which appears to be at the mouth of the south-west pass, and not included or connected with this or either of the other tracts of land exhibited on the plat. From this examination of the case, it is clear that the land in controversy was neither reserved from sale, nor appropriated to any purpose whatever.

As the United States have placed their right to recover in this case upon the single ground that the land was not subject to the pre-emption right of the defendants, because it had been previously appropriated for the use of the officers attached to the custom house at New Orleans, that point being decided against them, they ought not to prevail upon the second objection urged against the judgment; even if the judgment

were technically defective; but it being in the usual form of judgments, in the Courts of Louisiana, and not inconsistent with the justice of the case, we think it ought not to be disturbed.

It has, however, been suggested that fraud has been practised, in some way, by the defendants, in obtaining the land in controversy. Every thing on the face of the record appears to have been perfectly fair; and, as far as we can perceive, the defendants are legally entitled to a patent for the land. But if fraud has been practised upon the plaintiffs, the Courts of Chancery are open to them to seek a recision of the contract.

The judgment of the Court below is affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed.