## UNITED STATES *v.* TICHENOR and others.

*(Circuit Court, D. Oregon. June 5, 1882.)*

**1. RESERVATION OF PUBLIC LANDS IN OREGON.**

By the passage of the donation act of September 27, 1850, (9 St. 497,) and the amendment thereto of February 14, 1853, (10 St. 158,) congress disposed of all the public lands in Oregon to persons who were or should become settlers thereon and otherwise comply with the provisions of such act, except, among others, such portions thereof as might be designated by the authority of the president for certain military purposes and "other needful public uses," not exceeding 640 acres at any one point or place for a fort, nor more than 20 acres

for any other purpose. *Held,* (1) that while an order issued by the secretary of war designating a reservation under this act for a military post or station may be presumed to have been made by the authority of the president until the contrary appears, no such presumption arises in case such order is made by any one else, and therefore an order issued by the military officer in command of the department directing the establishment of " a military reservation " at Port Orford, Oregon, is void and of no effect; (2) that a valid designation of a reservation for military or light-house purposes must indicate or describe with reasonable certainty, in some public document or record, the quantity, limits, and location of such reservation, and the same ought to be noted, as soon as practicable, on the plat of the survey of the township; and (3) that such a reservation, if designated so as to substantially exceed the quantity allowed by law, is illegal and void.

2. PATENT ISSUED CONTRARY TO LAW.

When it appears on the face of a patent that it was issued contrary to law, it is void, and a court of law will so pronounce ; but nevertheless the United States is entitled to maintain a suit in equity to have such void patent cancelled.

3. POSSESSORY RIGHT OF MARRIED SETTLER.

A married settler, under the donation act, prior to completion of his residence and cultivation, may abandon or dispose of his possessory right or location without the consent of his wife.

4. LANDS—PURCHASE OF, FOR THE UNITED STATES.

A conveyance of lands to the United States is void and inoperative unless the purchase is authorized by congress. Section 3736 of the Revised Statutes.

5. FORT—MEANING OF THE TERM.

The term " fort," as used in the donation act implies a place of more permanence and strength than a mere frontier camp, post, or station.

6. PORT ORFORD.

Congress never authorized nor provided for the erection or maintenance of a " fort " at Port Orford.

7. PROMISE MADE UNDER ILLEGAL ARREST.

The arrest and eviction of the defendant William Tichenor, in 1864, from his donation claim at Port Orford, or that portion of it said to have been a " military reservation," and his subsequent imprisonment by military force and without process of law, were illegal acts, and any promise extorted from him as a condition of his liberation, concerning his future claim to the premises, was and is void and of no effect ; neither would a verbal promise of non-claim, however induced or made, be sufficient to affect his right to or interest in the premises.

8. ALLEGATION OF FRAUD.

It is not sufficient to allege in a bill to set aside the patent to a " settler " that it was " fraudulently " obtained by means of " false proof," but the acts constituting the fraud should be substantially stated.

9. RESIDENCE AND CULTIVATION OF A " SETTLER."

A settler under the donation act is not required to reside " all over " his claim, nor to cultivate the whole of it, and therefore his proof of residence and cultivation is not false if he actually resided anywhere within the exterior lines of the claim and cultivated any portion of it.

10. LAPSE OF TIME.

Mere lapse of time is a defence in equity in cases not within the operation of the statute of limitations.

11. SALE OF PUBLIC LANDS.

    A sale of public lands unauthorized by law is void, and the purchaser thereat acquires no right thereby, whether he knew or did not know of such want of authority.

Suit to Annul a Patent.

*Rufus Mallory,* for plaintiff.

*William Strong,* for defendants.

*Edward W. McGraw* filed a brief for defendants.

Before SAWYER, C. J., and DEADY, D. J.

DEADY, D. J. This suit was commenced on August 25, 1880, against the defendants William Tichenor and Elizabeth, his wife, to set aside and cancel the patent issued to said defendants on February 5, 1866, for the donation claim No. 37, the same, as alleged, being parts of sections 32 and 33 in township 32 S., of range 15 W., of the Wallamet meridian, and situate in Curry county, Oregon, so far as the same includes a certain "military reservation;" or that the defendants be declared the trustees thereof for the plaintiff, and required to convey the same to it. On April 13, 1881, a supplemental bill was filed, in which the death of the defendant Elizabeth Tichenor was alleged, and by which her children, Jacob B. Tichenor, Anna Dart, and Sarah E. McGraw, and the husbands of the two latter, George Dart and Edward W. McGraw, were made defendants in the suit. The bill alleges—

That in July, 1851, the defendant William Tichenor settled upon said donation No. 37 under the donation act of September 27, 1850, and immediately laid out a town thereon, which he called Port Orford; that in September, 1851, Lieut. Wyman, of the United States army, with the consent of William Tichenor, erected some buildings upon a portion of said town site for the use of the United States soldiers when stationed at that point; "that on October 16, 1851, Gen. Hitchcock, then in command of the United States troops stationed at that place, ordered that a military reservation be established there, and that a tract of land be selected and set apart and reserved for that purpose;" that soon after, and in pursuance of said order, said Wyman " caused a tract of land to be marked out for and as a military reserve," including the buildings aforesaid, and bounded, so far as it was within the lines of said donation, as follows: " Beginning where the east line of Redwood street in said town of Port Orford prolonged strikes the south line of Tichenor's claim; thence along said prolonged line and its continuation, the east side of Redwood street, to the south-east corner of Redwood street and Third street; thence along the south side of Third street and said side continued until it strikes the west line of Tichenor's claim, thence along said line in a southerly direction to the south-west corner of Tichenor's claim; thence along the south line of Tichenor's claim to the point of beginning,"—of which

acts said William Tichenor had notice and consented thereto, and that about March 17, 1852, said "military reservation was duly published;" that said William Tichenor and Elizabeth, his wife, released the premises "to the department quartermaster general for the use of the United States," and thereafter, on October 24, 1852, in order the more fully and certainly to secure the same to the United States, said defendants "released and quit-claimed to the United States all right or interest" in the premises, and "abandoned the same to the United States;" that on September 11, 1854, "the president of the United States formally declared a reservation for light-house purposes, at said Port Orford, that included said portion of the reservation as well as other lands not within the limits of said donation;" that about September 29, 1856, said William Tichenor made the proof of his four years' residence and cultivation upon the donation claim aforesaid, as required by said donation act, before the officers of the proper land-office, and "fraudulently" included therein so much of the reservation aforesaid as fell within the lines of his donation, "whereas, in truth and in fact, he had not so resided upon, cultivated, or claimed" the same "as part of his donation" after "the said military reservation was marked out;" that "by means of said false proof" said William Tichenor "induced the officers of the United States," on February 5, 1866, to issue a patent for the whole of said donation, including the tract so reserved, to himself and wife—the north half to the former and the south half to the latter; that the portion of said reservation included in said patent lies within the wife's half of the donation, and the said patent was so far procured by said William Tichenor "in fraud of the rights of the United States."

The bill then proceeds with a sort of a restatement of the case upon "information and belief," to the effect that after said reservation was marked out, said William Tichenor surrendered all control of the portion within his donation to the United States; that afterwards said William Tichenor was appointed collector of customs at the port of Port Orford, before which time the troops had been withdrawn from said place and the reservation left in charge of an agent of the United States; that by permission of the United States he occupied one of the buildings on said reservation as collector aforesaid, but afterwards made a claim to the same as against the United States, whereupon he was removed therefrom and the premises again placed in the charge of an agent; that in October, 1864, said William Tichenor and others drove said agent "away from said premises by force," and they were arrested therefor "by the military authorities of the United States" and imprisoned in Fort Alcatraz "for a considerable time;" that upon being released from said imprisonment said William Tichenor "pledged his word of honor that he would not interfere with or in any manner lay claim to the said reservation," but notwithstanding such pledge "he afterwards laid claim to said

land and made final proof of residence and cultivation thereof, as hereinbefore stated, and so fraudulently and wrongfully procured the patent therefor, as herein stated. The defendants demur to the bill, and for cause of demurrer say—

(1) The court has no jurisdiction because the plaintiff has an adequate remedy at law; (2) the plaintiff is not entitled to the relief asked upon the case stated; (3) the bill is multifarious; (4) it is without equity, in this: (a) The boundaries and extent of the alleged reservation are not given with any certainty or exactness, nor does it appear that it included the premises in controversy; (b) it does not appear that it was made for a "fort," nor that it does not exceed 20 acres in extent, but the contrary; (c) the reservation does not appear to have been made on public lands, nor that it was made under the authority of the president; (d) no facts constituting the alleged fraud on the part of the defendant William Tichenor are stated; (e) the alleged reservation is void, as appears from the bill; and (f) that Elizabeth did not execute a legal conveyance of the premises to the plaintiff.

There are no maps or diagrams of the locality of the Tichenor donation or the alleged reservation attached to the bill, and the description of the premises contained in it conveys no definite or certain information as to their location or quantity, unless reference is had to the public surveys. Authenticated copies of these and of the patent to the Tichenors, with a copy of the proofs upon which it issued, and the official survey of the donation No. 37 thereto attached, were submitted by counsel for the plaintiff on the argument of the demurrer, and the facts contained in them will be referred to and considered as a part of the bill, or as official acts of the executive department of the government within the judicial knowledge of the court.

And first, the bill is incorrect in describing the donation No. 37, in effect, as being only parts of sections 32 and 33 of township 31 south, of range 15 west. From the surveys it appears that said donation comprises 404.14 acres in said sections 32 and 33, and also 237.20 acres in sections 4 and 5 of township 33 south, of the same range; and that the premises in controversy in this suit lie wholly in the south-west quarter of said section 5, and probably contain not to exceed 20 acres, while the remainder of the reservation marked out as alleged in the bill lies immediately to the westward of the Tichenor donation, and taken altogether contains over 200 acres.

The allegation that the defendant, William Tichenor, after his release from Alcatraz in 1864, made final proof of his residence and cultivation on the donation No. 37, is also erroneous as appears from

the bill itself and the documents submitted therewith, said final proof having been made some eight years before that date.

On an extract from "the surveyor general's map of Oregon," at sundry points on the line of the coast, of which Port Orford is one, certain circular-shaped tracts, containing no specified quantity, were surrounded with a blue shading, and on September 11, 1854, the president indorsed thereon: "Let the tracts shaded blue on the within diagram be reserved for light-house purposes.

     [Signed]                     " FRANKLIN PIERCE."

On September 15, 1854, this diagram was sent by the commissioner of the general land-office to the surveyor general of Oregon, with a letter informing him that the president "has directed the reservation of a sufficient quantity of land at each point for light-house purposes, as follows: * * *, at Cape Orford or north cape of Tichenor bay;" and instructed him "to cause the same to be noted on the maps and documents" of his office, so that they would not be overlooked when the surveys of the public lands should be extended to these points; and added: "The light-house board has promised to furnish this office with descriptions of the exact locations, when made, and copies thereof will be forwarded to you when received." But it does not appear from the public surveys that any note or memorandum of any such reservation was ever entered or made thereon. In fact, no specific reservation was made or designated by the president's order. It was, in legal effect, only a precautionary direction that reservations *should* be established at the points named when the surveys were extended there; and, evidently, it was contemplated that the final location and description of them would be made by the light-house board, and furnished to the land-office for formal entry on the maps of the public surveys.

A reservation for light-house purposes at that date could only be made by authority of the president upon the assumption that it was a "needful public use," and then it could only contain 20 acres. How much land was contained within the blue lines on the diagram indorsed by the president on September 11, 1854, no one knows; nor were they intended to do more than to indicate the point or headland where such reservation should be made thereafter.

But it is now understood that so far as this case is concerned the claim that the premises in controversy are within a light-house reservation is abandoned, and it is admitted by the counsel for the plaintiff that if there is a reservation for light-house purposes at Port Orford it lies wholly to the south and west of the Tichenor donation

over on the headland. Besides, it was not in the power of the president to establish or declare a reservation for light-house purposes upon land already reserved for military or other purposes. If there was a valid reservation established at Port Orford prior to September 11, 1854, for a military post, as claimed by the plaintiff, the land contained in it was thereby appropriated and withdrawn from the public domain, and could not be thereafter otherwise appropriated, except by the authority of congress. *Wilcox* v. *Jackson*, 13 Pet. 513.

As to the first point made by the demurrer, it is not well taken. True, if the patent was issued contrary to law, as alleged, and that fact appeared upon the face of the patent when compared with the law, it is void, and a court of law would so pronounce. But the United States is also entitled to have such void patent cancelled, and may maintain a suit in equity for that purpose. *U. S.* v. *Stone*, 2 Wall. 535; *U. S.* v. *C. P. Ry. Co.* 9 P. C. Law J. 340; *W. S.* v. *Mullan*, 9 P. C. Law J. 116. Neither is the objection that Mrs. Tichenor's conveyance or quitclaim to the United States was not duly executed, of any moment.

At the date of the alleged conveyances the claim was occupied by the husband as a settler thereon, under the donation act, engaged in the performance of the conditions of residence and cultivation, on the completion of which the title to the land would enure to him and his wife in equal parts. In the mean time the wife had no control over or interest in the premises. She was not a settler, and her husband could occupy or dispose of or abandon his possessory right in his claim without reference to her. When her husband complied with the conditions of the act making the grant, then she became the owner, as the direct donee of the United States, of the one-half of the land included in her husband's settlement. But until then it was in the power of the husband to abandon or dispose of his location or possessory right as he saw proper, and thereafter neither he nor his wife would have any interest in the premises under the act. *Lamb* v. *Starr*, 1 Deady, 360; *Fields* v. *Squires*, Id. 366; *Hall* v. *Russell*, 101 U. S. 509; *Vance* v. *Burbank*, Id. 520.

Neither did these conveyances of William and Elizabeth Tichenor have the effect to vest any interest in the premises in the plaintiff. Irrespective of the fact that the grantors in these deeds had nothing in the premises to convey except the possessory right of the settler, William Tichenor, there was no authority upon the part of the grantee to purchase, and therefore they were as conveyances void and inoperative. By section 7 of the act of May 1, 1820, (3 St.

56S: section 3736, Rev. St.,) relating to the treasury, war, and navy departments, it is provided "that no land shall be purchased on account of the United States except under a law authorizing such purchase." It is not claimed that there was any law authorizing any one to purchase this property, and without such authority the purchase was void. 11 Op. 202.

The only effect that can be given to these writings in this case is as evidence that the settler then and thereby abandoned so much of his claim, whereupon it again became a part of the public domain, and might be appropriated by any one to any purpose or use authorized by law.

The authority to establish a reservation of the public lands in Oregon for any purpose is found in section 14 of the donation act of September 27, 1850, (9 St. 500,) and section 9 of the act of February 14, 1853, (10 St. 158,) amendatory thereof. In the first it is declared—

" That such portions of the public lands as may be designated under the authority of the president of the United States for forts, magazines, arsenals, dock-yards, and other needful public uses, shall be reserved and excepted from the operation of this act: provided, that if it shall be deemed necessary, in the judgment of the president, to include in any such reservation the improvements of any settler made previous to the passage of this act, it shall in such case be the duty of the secretary of war to cause the value of such improvements to be ascertained, and the amount so ascertained shall be paid to the party entitled thereto out of any money not otherwise appropriated."

The pre-emption act of September 14, 1841, (5 St. 657), was not extended over Oregon until July 17, 1854, (10 St. 305,) and this is the first act of congress providing for the disposition of or affecting the title to public lands in Oregon, unless it be the grant to certain religious societies of the missionary stations occupied by them, contained in section 1 of the act of August 14, 1848, (9 St. 323.) *Parish* v. *Lownsdale*, 21 How. 290; *Lownsdale* v. *City of Portland*, 1 Deady, 7, 13.

By section 9 of the amendatory act, *supra*, the power of the president to reserve lands from the operation of said act was qualified, so that all reservations theretofore and thereafter made under said section 14 of the original act should be limited to an amount not exceeding 20 acres at any one place, except in the case of "forts," when the amount should not exceed 640 acres at any one place.

The power to dispose of the public lands is granted to congress. Article 4, § 3, U. S. Const.; *U. S.* v. *Gratiot*, 14 Pet. 537. No appro-

priation of them can be made for any purpose but by the authority of congress. *U. S.* v. *Fitzgerald*, 15 Pet. 421. By the donation act, congress disposed of all the public lands in Oregon to persons who should become settlers thereon and otherwise comply with the provisions of that act, except mineral lands, lands reserved for salines, and such portions thereof as might be designated by the authority of the president for "forts," etc.

The reservation must be designated—marked out—and appropriated to the permitted public use by the president or under his direction. What constitutes such a designation may be a question. At least, the reservation ought to be described or indicated with reasonable certainty as to limits and quantity, in some public document or record, and probably it ought to be noted on the maps of the public surveys. *Wilcox* v. *Jackson*, 13 Pet. 512; *U. S.* v. *Fitzgerald*, 15 Pet. 419.

But it does not appear from the public surveys that a reservation at Port Orford was ever noted thereon for any purpose. Neither is there any allegation in the bill that the reservation was ever designated or marked on the map of any survey; and, what is more, that it was designated or authorized at all, by the president.

It may be admitted, as suggested in *Wilcox* v. *Jackson*, 13 Pet. 513, that if the order directing the reservation to be made had been issued by the secretary of war,—the head of the department through whom the president would speak and act upon the subject,—in the absence of evidence to the contrary, it would be presumed that he acted by the direction of the president. But neither Gen. Hitchcock nor Lieut. Wyman had any authority to designate or establish a reservation at Port Orford for any purpose. It is not alleged that they were acting in the premises under the authority of the president; and there is no presumption of law that they were. It may also be admitted that Gen. Hitchcock could direct his subaltern, engaged in military operations in Oregon, to establish and occupy a camp or fort on the public lands therein; or that the latter might do so under the circumstances without any direction from the former. But such use or occupation would not have the effect to impart any special character to the land, or constitute it a reservation for any purpose, within the purview of the donation act. It would still remain open to the claim of any qualified settler under the act, and as soon, at least, as the camp or post was removed or abandoned by the military force, might be actually occupied by any such settler.

So soon as Tichenor became a settler upon this land under the donation act there was no longer any power in the president to ap-

propriate it for any purpose. It had thereby become private property, and could only be taken for public uses by authority of congress acting under the right of eminent domain, and upon making just compensation therefor. Fifth Amend. U. S. Const. And admitting that afterwards Tichenor abandoned the portion of his claim constituting the premises in controversy, and that it thereupon became a portion of the public domain and was liable to be reserved by the authority of the president for any of the public uses specified in the statute, still there is nothing to show that such reservation was ever made, and therefore Tichenor had the right to include it in his claim when he made his final proofs in September, 1856. But even supposing there was a valid reservation of over 200 acres established at Port Orford for military purposes prior to February 14, 1853, it became void thereafter, except as to 20 acres thereof; and until it was redesignated by proper authority, with boundaries including no more than this quantity, it had no legal existence anywhere. If there had been a reservation designated for the purpose of a "fort" it might have been extended over 640 acres; but there is no allegation in the bill that this reservation was made for such purpose, and the facts stated show plainly that it was not. The bill characterizes it as a "military reservation;" but that is a term unknown to the law and means nothing, except that it may have been intended for a fort, magazine, arsenal, camp, post, or other military use. A "fort" is something more than a mere military camp, post, or station, such as are usually established and occupied for a few years on the border between new settlements and the wild Indian tribes. The term implies a fortification or a place protected from attack by some such means as a moat, wall, or parapet. In this sense it is common knowledge that there never was a "fort" at Port Orford, or anything else than a military camp or post consisting of a few log cabins for the shelter of the troops, and the ordinary guard-house and parade ground, occupied by a small detachment of soldiers—often less than a company, under the command of a single lieutenant,—which was abandoned in the summer of 1856, at the close of the Indian war in southern Oregon, when the Indians of that region were moved up the coast, on the reservations to the north of the Umpqua river. Nor does there appear to have been any recognition of this post as a "fort" by congress, in directing it to be established, or appropriating money for buildings or fortifications there. Its occupation was a mere incident of the temporary presence of a small detachment of soldiers in that region during the settlement of Indian difficulties. Nor can the extraordi-

nary transaction related in the bill, from which it appears that in 1864—eight years after Tichenor's claim to the premises as a settler under the donation act had been proven and allowed in the local land-office—a military force, without law or process, was used to eject him therefrom, and remove him to another state and confine him there in a military prison, until he was constrained to promise not to again lay claim to the premises, have any effect upon the standing of the plaintiff in this case, unless it is to make it a party by adoption to that illegal outrage upon the rights and liberty of an American citizen. A promise made under such circumstances has no legal obligation. And if the circumstances had been otherwise, it would not have given the plaintiff any new or additional right to the property. A mere promise or agreement, without a lawful consideration, cannot affect the title to land or the right to the possession thereof.

In the bill it is alleged that the patent was "fraudulently" obtained by means of "false proof," but in what the fraud consists, or wherein the proof was false, is not stated. Such an allegation is not sufficient on demurrer. The bill should have gone further, and set forth the substance, at least, of the acts constituting the fraud, or stated wherein the proof was false. Story, Eq. Pl. § 251; *Oakland* v. *Carpentier*, 21 Cal. 663; *Semple* v. *Hagar*, 27 Cal. 166.

But on the argument, and in the brief filed, counsel for the plaintiff rests his case almost wholly upon the ground that Tichenor obtained the patent to the premises in controversy by the use of false proof before the local land-office, to the effect that he resided upon and cultivated the same when he did not; and tacitly abandoning the ground for relief that the premises were reserved from the operation of the donation act, and therefore the patent was so far void, it is now claimed that admitting there was no valid reservation thereof, still the patent should be cancelled on the ground that Tichenor did not reside upon and cultivate the disputed tract, as stated in his proof and recited in his patent.

Admitting that the United States may maintain a suit to annul a donation patent upon the ground that the proof of residence and cultivation upon which it issued was false, yet that is not the case attempted to be made by this bill, in which the ground of the relief sought is that the patent includes land legally reserved from settlement under the donation act, and is therefore so far void. But this argument proceeds upon the radically-erroneous assumption that the residence and cultivation required by the donation act must extend to or include every acre of the donation. On the contrary, it is only

necessary that the residence and cultivation should be on some part of the tract on which the settler "proves up." In this case the residence and cultivation of the settler was upon the tract of land—within its exterior limits—on which he notified and made his final proof; and his proof to that effect cannot be false, even if it should turn out that some portion of the tract was not open to settlement. His proof was not, as it need not have been, to the effect that he lived upon and cultivated the particular 20 acres in controversy here, or any portion of it; but only that he lived upon and cultivated some portion of a tract, not exceeding 640 acres, which included this 20 acres.

Admitting, as the plaintiff does, that Tichenor resided upon and cultivated some portion of his donation for four consecutive years, there was no falsehood in his proof to that effect, even if some other portion of it had been withdrawn from settlement by a valid reservation. It was not his duty to know whether his claim included a part of a valid reservation, and notify the land-office of the fact, but rather the duty of the government to have the reservation, if any, properly surveyed and noted on the township maps of the public surveys for the information of all concerned, none of which appears to have been done. Besides, the plaintiff has been guilty of gross laches in the premises, and its claim has become stale. The defendant William Tichenor had been in the possession of the premises as a settler, having made his final proof, for 24 years before the commencement of this suit, and had received and undisturbedly occupied the premises under his patent for 14 years prior thereto; and although the statute of limitations does not run against the United States, it is subject, nevertheless, when it comes into a court of equity to assert a claim, to the rules and defences peculiar to a court of equity. Such a defence is "the mere lapse of time and the staleness of the claim, in cases where no statute of limitations directly governs the case." Story, Eq. Pl. § 813; Story, Eq. Jur. § 1520, and authorities cited in note 3.

In this case all the elements of this defence are present, and the defendants ought to have the benefit of it.

The demurrer is sustained, and the claim of the plaintiff being stale and its bill without equity, the same is dismissed.

SAWYER, C. J., concurring. In my judgment the facts alleged in the bill do not show a valid reservation of the lands described therein

for any public purpose, or present any sufficient ground for equitable relief. I therefore concur in the order sustaining the demurrer and directing a decree dismissing the bill.

See Same Parties, *post*, 449. See, also, *Neilson* v. *Lagow*, 12 How. 98.

TERRITORIAL PROPERTY. In article 4, § 3, subd. 2 of the constitution of the United States, defining the power of congress as to the disposition of the territory or property belonging to the United States, "to dispose" means to make a sale of the lands, or otherwise to raise money from them,(a) and includes the the power to lease;(b) but all disposition must be by authority of congress.(c) "Territory" is equivalent to the word "lands," and the words "respecting the territory" refer only to the "territory" owned by the United States at the time of the adoption of the constitution.(d) Subsequently-acquired territory is subject to the legislation of congress as an incident to its ownership.(e) The right to govern is the inevitable consequence of the right to acquire.(f) In legislating for the territories, congress exercises the combined powers of the general and of the state governments.(g) It has the absolute power of governing and legislating for the territories, and may give jurisdiction to the territorial courts;(h) but such courts are not courts of the United States.(i) The general jurisdiction over the place, subject to this grant of power, adheres to the territory as a portion of the states not yet given away.(j) "Needful rules" means appropriate legislation,(k) including the passage of all laws necessary to secure the rights of the United States to the public lands, and to provide for their sale, and to protect them from taxation.(l) It can make all needful rules and regulations, but only for the disposition and protection of lands within the limits of a state.(m) So, it may provide that all contracts and transfers relating to such land, made before the patent issues, shall be void.(n) It has the absolute right to prescribe the times, conditions, and modes of transfer of the public domain, and to whom transfer shall be made,(o) and it has the sole power to declare the dignity and effect of United States titles;(p) and, when the acts of congress make a patent necessary to complete the title, no state can make anything else evidence of title;(q) nor can a state pass a law depriving a patentee of the possession of property by reason of delay in the transfer of title after initiation of proceedings for its acquisition.(r)—[ED.

(a) Scott v. Sandford, 19 How. 615.

(b) U. S. v. Gratiot, 1 McLean, 454; S. C. 14 Pet. 526; Shawk's Case, 4 Op. Atty. Gen. 487.

(c) U. S. v. Nicoll, 1 Paine, 646; Seabury v. Field, 1 Wall. 1; U. S. v. Fitzgerald, 15 Pet. 407; McConnell v. Wilcox, 2 Ill. 344.

(d) Scott v. Sandford, 19 How. 442.

(e) Am. Ins. Co. v. Canter, 1 Pet. 511.

(f) Am. Ins. Co. v. Canter, 1 Pet. 511; U. S. v. Gratiot, 14 Pet. 526; 1 McLean, 454; Scott v. Sandford, 19 How. 393; Coop v. Harrison, 16 How. 164.

(g) Am. Ins. Co. v. Canter, 1 Pet. 511.

(h) Sere v. Pitot, 6 Cranch, 332; Satersdorfer v. Webb, 20 How. 182.

(i) Hunt v. Palao, 4 How. 589; Clinton v. Englebrecht, 13 Wall. 448; explaining Orchard v. Hughes, 1 Wall. 73.

(j) U. S. v. Bevans, 3 Wheat. 337; Smith v. Maryland, 18 How. 71; The Wave v. Hyer, Blatchf & H. 235; S. C. 2 Paine, 131.

(k) Scott v. Sandford, 19 How. 615.

(l) Pollard v. Hagan, 3 How. 212.

(m) U. S. v. Railroad Co. 6 McLean. 517; Rose v. Buckland, 17 Ill. 309; Dyke v. McVey, 16 Ill. 41.

(n) Dyke v. McVey, 16 Ill. 41; Rose v. Buckland, 17 Ill. 309.

(o) Irvine v. Marshall, 20 How. 558; Gibson v. Chouteau, 13 Wall. 92.

(p) Bagnell v. Broderick, 13 Pet. 436.

(q) Wilcox v. Jackson, 13 Pet. 498.

(r) Gibson v. Chouteau, 13 Wall. 92.