Oakland v. Carpentier.

# CITY OF OAKLAND v. CARPENTIER et al.

A COMPLAINT in equity, filed for the purpose of setting aside a grant, on the ground that it was obtained by fraud, must state specifically and definitely the facts constituting the fraud.

The validity of a public act of the Legislature is in no respect impaired by the knowledge or ignorance at the time of the action of the Legislature in passing it on the part of the parties who may be affected by its operation.

A municipal corporation cannot invoke the aid of a Court of Equity to set aside a grant made by its authorities when the grant is void. Such a grant, being a nullity, casts no cloud upon the title of the corporation, and offers no embarrassment to the exercise of its legitimate functions.

Where the Board of Trustees of a municipal corporation makes a grant of its franchises and lands which is not void, but only voidable, the corporation cannot obtain the aid of a Court of Equity to set aside the grant without doing equity—that is, without tendering compensation to the grantee for the expenditures which he may have incurred under the grant, relying upon its validity.

The Trustees of the town of Oakland, in 1852, by ordinance, granted to the defendant, H. W. Carpentier, certain franchises and lands, on condition that the grantee should erect certain wharves and other improvements, and pay to the town a certain per centage of the wharfage received. In 1853 the Board of Trustees ratified and confirmed the ordinance. In 1857, and after Carpentier, supposing the grant to be valid, had made expenditures in erecting the wharves and improvements required by the ordinance, the city of Oakland, the corporation which had succeeded to the rights and interests of the town of Oakland, commenced suit for the purpose of having the grant set aside, on the ground that it was obtained by fraud, and constituted a cloud on the city's title : *Held*, that if the ordinances granting the franchises and lands were void, there was no occasion for the interference of equity; that if they were only voidable, its interference could not be invoked until equity was done by the city, by placing, or offering to place, the grantee, who had relied upon the acts of the agents of the town, in the same position which he would have occupied but for his reliance upon their validity. .

APPEAL from the Third Judicial District.

The facts are stated in the opinion. The case was before this Court at the April Term, 1857, on appeal from an order sustaining a demurrer to the complaint, a report of which will be found in 13 Cal. 540. A trial was subsequently had in the lower Court, resulting in a judgment for the plaintiff, from which the present appeal is taken by defendants.

*W. H. Patterson,* for Appellants.

I.   The lands in controversy are partly swamp and overflowed lands, and partly lands between high tide mark and ship channel of the bay of San Francisco.   Hence the title to a part thereof, and dominion over such portion, was in the State of California. (*Pollard's Lessee* v. *Hagan,* 3 How. 212; *Holliday* v. *Frisbie,* 15 Cal. 630.)

The State could grant that portion of the lands to which she had title, and the right to erect and maintain wharves, and collect wharfage, to the town of Oakland.   (Gardiner's Institutes, 273; *Sacramento* v. *The New World,* 4 Cal. 41, 45; see the statute under which that case was decided, Session Laws of 1852, p. 195, sec. 7.)

The proprietor, (the State) by law of May 4th, 1852, granted said lands in fee to the town of Oakland.   Section one incorporates a certain territory as the town of Oakland, ship channel being one of the boundaries of the territory; section two vests corporate powers in a Board of five Trustees; section three is as follows:

" The Board of Trustees shall have power to lay out, make, open, widen, regulate, and keep in repair, all streets, etc., wharves, docks, piers, slips, etc., and to authorize the construction of the same, and with a view to facilitate the construction of wharves and other improvements the lands lying within the limits aforesaid, between high tide and ship channel, are hereby granted and released to said town; *provided,* that said lands shall be retained by said town as common property, or disposed of for the purposes aforesaid, to regulate and collect wharfage and dockage."

This was a grant of a present, immediate, and vested interest, from the proprietor to a party capable of receiving it.   (For similar grants, see Lester's Land Laws, p. 61, sec. 8; Laws of California of 1851, p. 309, sec. 2; *Doll* v. *Meader,* 16 Cal. 295, and cases cited by the Court; *Holliday* v. *Frisbie,* 15 Id. 630.)

By that statute there is: first, a grant to the town of Oakland and its grantees of a portion of the lands in controversy; second, the right to erect and maintain wharves and collect wharfage; third, express authority to the town to dispose of the thing granted for the purpose of facilitating the construction of wharves and

other improvements. Such disposition might be : first, by absolute sale of the whole or a part; second, by lease for a term of years at a fixed rent; third, by grant, absolute, as was done by the ordinance. (*Argenti* v. *City of San Francisco*, 16 Cal. 255 ; Angell & Ames on Corporations, 153, 159, 3d ed.)

We quote : " Corporations aggregate have at common law an incidental right to alien or dispose of their lands and chattels, unless specially restrained by their charters or positive statute. Independent of positive law, all corporations have the *jus disponendi*, neither limited as to object, nor circumscribed as to quantity." (2 Kent's Com. 227 ; *The Mayor, etc.,* v. *Lawton,* 1 Ves. & Beames, 226 ; *Binney's Case,* 2 Bland's Ch. 142.)

" A corporation authorized to dispose of its property may, in general, dispose of any interest in the same it may deem expedient, having the same power in this respect as an individual." (*Reynolds* v. *Com. of Stark Co.,* 5 Ham. [Ohio] 205.) Thus it may lease, grant in fee, or tail, or for term, or life. (*Jackson* v. *Brown,* 5 Wend. 590 ; 8 Watts, [Pa.] 385 ; Coke Lyttleton, 44 *a,* 300, 401, 325 *b,* 341 *b,* 342 ; 1 Kid on Cor. 108, 116.)

Not having established a different rule by statute in this State, the authorities above referred to govern in this case. But in the present case we are not driven to rely upon the common law authorities, because the power of disposing of all that was granted to the corporation of Oakland is expressly given, and the term is not specified or restricted.

The disposition of the property, etc., made by the ordinance was a strict compliance with the object for which the State made the grant to Oakland.

II.   The ordinances of the town of Oakland granting to defendant, H. W. Carpentier, the lands, etc., were ratified and confirmed by the act of the Legislature of May 15th, 1861, amending the charter of the city of Oakland.

That the act is sufficient on its face to ratify and confirm said ordinances, and that the municipal corporation of Oakland was under the control of the Legislature, which body had power and authority to confirm, ratify, and validate such ordinances, is settled by the following authorities: *Moore* v. *Patch* (12 Cal. 265) ;

*Cowell* v. *Daub* (Id. 273); Sedg. on Stat. 199; *Hart* v. *Burnett* (15 Cal. 612). And such ratification and confirmation took effect without any action on the part of the corporation of Oakland.

The attempt to show that this act was passed by fraud utterly fails. When and how were the one hundred and sixteen legislators corrupted, defrauded, or deceived into voting for the act? How and by whom was the Governor induced to approve of it? The proposition that an enactment of the law-makers can be disregarded and set aside upon evidence that Carpentier concealed from one of the legislators, who introduced it, the object intended by its passage, is too absurd to be worthy of the consideration of a Court.

If a law of our State is to be set aside and disregarded on such pretexts, upon no proof, but upon a suspicion of fraud, we shall expect to see the entire enactments of the Legislature set aside by a bill in equity. Conceding, for the sake of the argument, that this confirmatory statute might be set aside for fraud, it must be fraud in fact. It must be clearly and unmistakably shown that enough of the legislators who voted for it to secure its passage so voted because they were deceived or corrupted, neither of which can be assumed, and neither was attempted to be proven. If, as we insist, this statute is a law, and to be upheld, there is an end to plaintiff's case, as it ratifies and makes valid, not only the ordinance of May 17th, 1852, but also the ordinance of August 27th, 1853.

Another proposition to be considered is whether a void act can be ratified—not because the question properly arises in the case, but because it is claimed to by the plaintiff. It is contended that the doctrine which denies the confirmation of a void act, as between private parties, can be successfully invoked in the case of a ratification by the sovereign. We have been unable to find a single authority to sustain this position; but, on the other hand, many which draw the distinction between the two cases, and with unanswerable reasoning affirm the validity of the ratification by the sovereign of a void act. (*Wilkinson* v. *Leland*, 2 Pet. 627; *Watson* v. *Mercer*, 8 Id. 88; *Hess* v. *Wertz*, 4 Sergt. & R. 356; Comyn's Dig. confirmation D; 1 Rol. 483, b. 5; *Payne* v. *Treadwell*, 16 Cal. 233.)

III.   Plaintiff does not offer to do equity, and cannot therefore have any standing in a Court of Equity.   The following facts are established by admissions in the pleadings, and by the findings of the Court:

1st. That in 1852 the town of Oakland had no wharves, no funds, and no ability to erect such wharves or a school-house.   2d. That at the time of the passage of the ordinance of May, 1852, the whole of the land granted by the Legislature was not worth to exceed $5,000.   3d. That H. W. Carpentier complied strictly with the terms and conditions of said ordinance.   4th. That Carpentier in pursuance thereof, in 1852, erected a school-house at an expenditure of $1,600, and in the same year erected wharves at a cost of $40,000 ; that such school-house was accepted and used by plaintiff up to the filing of the complaint (and, as appears by the testimony, up to the time of the trial).   5th. That no part of such expenditures has been returned to the defendants, either from receipts from the wharves or by voluntary payment by plaintiff. 6th. That the erection of such wharves materially contributed to the growth and prosperity of Oakland.   7th. That defendants have kept said wharves in repair and subject to the use of the public. 8th. That unreasonable tolls, wharfage, or dockage, have not been charged at such wharves.   9th. That the plaintiff has derived revenue therefrom, by the imposition and collection of taxes, and by the receipt of two per cent. of the gross amount of wharfage, etc.

If there · was any fraud or misconduct, the corporation of the town of Oakland, and its successor, the city of Oakland, participated in the fraudulent act, and derived benefit therefrom.

The interposition of Courts of Equity is governed by an " anxious attention to the claims of equal justice, and therefore it may be laid down as an universal rule, that they will not interfere unless the plaintiff consents to do that which the justice of the case requires to be done."   (Fonblanque's Eq. 219 ; Francis' Maxims.)

It is not necessary to argue that the corporation ought not to retain the school-house and the wharves erected with defendant's money without returning the principal and interest.

The maxim, " He who seeks equity must do equity," lies at the foundation of equity jurisprudence.    (3 Sand. S. C. 671 ; 1 Sto. Eq. Jur. sec. 64, p. 76, and cases, note 5.)    And for not making the offer of payment, plaintiff's bill should be dismissed, and final judgment rendered for the defendant.    (1 Sto. Eq. Jur. sec. 301 ; 4 Brown's Ch. 436 ; 1 Johns. Ch. 367 ; 5 Id. 142.)

IV.    The several charges of fraud, as averred or attempted to be averred in the complaint, are not sustained.    The first charge is that by fraud and collusion Carpentier procured the passage of the act of incorporation without the consent of the people of the town, etc.    We answer: 1st. The fraud charged was not upon the town of Oakland, or the inhabitants thereof, as neither had any estate in the water front, nor any privileges of which to be defrauded.    The fraud, if any, was upon the State, because a grant of the lands, wharf privileges, and corporate powers, was obtained from the State, and not from the inhabitants of Oakland, and the State is not a party complaining.    2d. If the Act of 1852 was void for fraud, then plaintiff had no standing in Court, and no title to be affected by this action, or by the acts complained of.    3d. The charge is unsupported by any evidence.

The next charge is that Carpentier fraudulently procured the election of a majority of the Trustees under the charter of 1852, and that two of the Trustees were partners of defendant.    The charge that he procured their election is wholly unsupported by the evidence.    It is not shown that he even resorted to any of the usual modes of carrying an election.    He is not shown to have even voted himself; and the most he is shown to have done was to have had one or two tickets in his possession.    It is not claimed that the other two Trustees were corrupted, or under the influence of the defendant, and they composed one-half of the Board who were elected and qualified.    But it is said that the first two were partners of the defendant, not in procuring the ordinances complained of, but in the sale of lands.    There is no evidence of it. The whole charge is unsupported.

The next charge is that Carpentier procured fraudulently the passage of the ordinance of May 17th–18th, 1852.    The ordinance passed by unanimous vote—ayes and noes being called.    It was

not adopted hastily—it was reconsidered and amended. No promise or inducement was held out to the Board of Trustees, or any member thereof, to secure its passage. Within the corporate limits were about thirty or forty inhabitants, all told, two houses, and a half dozen shanties. It possessed no school-house, no wharves, and no money in the treasury with which to erect either. Its entire corporate property did not exceed $5,000. The power to impose taxes was at that time but a shadow. Tested by the state of affairs then existing, any honest man would say the corporation made a good bargain, and Carpentier a bad one, by the grant contained in the ordinance and the performance of its conditions.

We insist that the plaintiff's side of this case is so devoid of equity that the material averments of the case, and the findings of the Court below, are so wholly unsupported by the evidence, and the equities of the defendants so strong, that this Court should place upon the record a complete refutation of all the charges of legal or moral fraud and wrong, and should go further and direct judgment final for defendant, as was done in *McMillan* v. *Richards* (12 Cal. 421); *Holliday* v. *City of San Francisco* (7 Id. 362); *Bagley* v. *Eaton* (10 Id. 126, 149); 18 Id. 339, 670; 2 Id. 81; 1 Id. 370.

*Eugene Casserly*, for Respondent.

I. By the Act of May 4th, 1852, which is the common source of title to both parties, the water front of Oakland was granted by the State to the town; not, however, in the absolute sense contended for by appellants, but by a special and qualified title, upon condition, subject and limited to certain specific uses and purposes of municipal government; and as inseparably connected with and accessory to those uses and purposes.

The purposes for which the State made the grant were, to enable the town to make, regulate, and keep in repair all wharves, docks, piers, etc.; to secure the construction of these essential improvements, and to enjoy in the utmost benefit the governmental powers and franchises bestowed upon it over the whole subject. "For these purposes," and to enable the town to carry them out, it was left in its power, from time to time, to lease or even sell such

portions of the water front as might be so "disposed of" advantageously, and without materially interfering with or impairing the governmental powers and franchises granted. No power was given to the town under any pretext or for any "purpose" to convey the whole of these lands in a body to the appellant, H. W. Carpentier, or to any other person.

The grant by the State to San Francisco of the water front in the "water lot bill" was of a totally different character. It was without limitation, except as to the term of years; and in all other respects was absolute and unqualified, vesting the property in private ownership, subject to all the usual incidents thereof. In *Holladay* v. *Frisbie* (15 Cal. 630) this circumstance was insisted on by this Court as distinguishing the title of San Francisco under the water lot bill from her title to her uplands; and as the reason why her property in the water lots was liable to levy and forced sale, while her upland property was not.

The doctrine for which I contend is fully and conclusively established by this Court in *Hart* v. *Burnett* (15 Cal. 530); a great case, of which, since the Judge who delivered the decision in it is no longer in this Court, I may be suffered to say that it will ever remain a monument of learning, ability, and comprehension of the whole subject of title to municipal property. Though the precise question there decided was as to the liability of the uplands of San Francisco to levy and sale under execution, yet the decision was itself the conclusion from premises identical with the doctrine claimed by us here, which is as true under our system of laws as it was under the Mexican, namely, that lands of a municipal body, which, by the terms of the grant from the sovereign power are devoted to specific public purposes, charged with certain conditions and made subject to expressed public uses, cannot be divested or disposed of to an individual so as to defeat or impair those purposes, conditions, and uses, with or without the consent of the officers of the municipality.

II. The ordinances and proceedings of the Trustees of Oakland, relied on by the appellants, either by way of original "grant" or subsequent "ratification," are not an exercise of the powers

42

granted by the statute, but are in gross excess and violation of them, and are therefore null and void.

The first and main ordinance has two principal sections : one giving, or purporting to give, to " H. W. Carpentier and his legal representatives for thirty-seven years the exclusive right and privilege of constructing wharves, piers, and docks," within the town, with the right of collecting wharfage and dockage during all that period, " at such rates as he may deem reasonable ;" and the other, granting, or purporting to grant, to Mr. Carpentier, and " to his assigns or legal representatives," the entire water front of the town between high tide and ship channel, " with all the improvements, rights, and interests " thereunto belonging, in fee-simple forever.

The first section is null and void, because it conveys, or attempts to convey, to H. W. Carpentier, and not only to him, but to all and singular " his legal representatives," for the period of thirty-seven years (in this State equal to a century of time elsewhere), first, the exclusive right and privilege of constructing wharves, piers, docks, and slips anywhere within the town of Oakland ; and second, of charging wharfage and dockage " at such rates as he may deem reasonable." This is in terms a grant to an individual of the entire body of municipal rights and powers in and over wharves, docks, etc., granted to the town by the Act of Incorporation.

Municipal corporations have no capacity to delegate in gross, or even materially to abridge or impair, the whole or any branch of the legislative power confided to them by law ; and any attempt so to do, whether directly by a grant of the power, or indirectly, as by the medium of a contract, is simply void. ( *Goszler* v. *George-town*, 6 Wheat. 597 ; *East Hartford* v. *Hartford Bridge Co.*, 10 How. 535, and cases cited ; *Thompson* v. *Schermerhorn*, 2 Seld. 92 ; *Brick Church* v. *City of New York*, 5 Cow. 538 ; *Coates* v. *Mayor, etc., of New York*, 7 Id. *585 ; *State, etc.*, v. *Mayor, etc., of New York*, 3 Duer, 130.)

The second section of the ordinance is in all respects a manifest violation of the statute. Upon its face it shows that the grant of the water front to Mr. Carpentier, was made in consideration of his agreement with the town to build for it " a public school-house." For this " purpose " expressly, the entire property was " disposed

of" to him.    Nothing is clearer than that this was not one of the " purposes aforesaid," specified in the statute.

It is a settled principle of law that where land or other property is held by a municipal corporation, as subject to and united with certain public uses and purposes, the property cannot be separated from the uses, and hence cannot be divested with or without the consent of the corporation.    The public use being the principal thing, and the property being the incident indissolubly connected with it, and the former being inalienable, the latter follows it. (*Hart* v. *Burnett*, 15 Cal. 590, recognizing the principle of *Ammant* v. *New Alexandria & P. T. Co.*, 13 S. & R. 210, and *Susquehanna Co.* v. *Bonham*, 9 Watts & Serg. 28, as clearly applicable to municipal corporations.)

The original ordinance being null and void to all intents and purposes, for illegal excess of power, it is unnecessary to consider the effect of the several subsequent ordinances, resolutions, acts, and proceedings of the town officers, in that and other years approving and accepting the wharves and school-house built by Mr. Carpentier, declining his offer to surrender the wharves and so on—by which it was sought to "ratify and confirm" it, successfully as counsel contend.    For that or any other such purpose they had no effect whatever.    What the Board of Trustees had no power, in any way, to do originally, they could not subsequently ratify or confirm.    The capacity to ratify involves, of necessity, the capacity to do originally the act ratified.    This is perfectly settled in this Court.    (*McCracken* v. *San Francisco*, 16 Cal. 623 ; *Zottman* v. *San Francisco*, 19 Id. 102.)    In these cases the original defect was in omitting to pursue the statutory mode of exercising the power ; and not as here, a total want of power, without reference to the form of the attempted use ; which is, of course, a stronger case.    The wonder is that it should ever have been doubted, being manifest good law and common sense.

III.    The Act of May 15th, 1861, amending the charter of the City of Oakland, which is relied on by the appellants, as ratifying and confirming the ordinances in question, cannot be so construed as to have that operation.    Such a construction nullifies and rejects several express special provisions for the sake of one general clause.

A clause or section of an act being, in its literal sense, inconsistent with the general scope and meaning of the act, is so construed as to make it harmonize therewith. (*Brown* v. *Wright*, 1 Green, N. J. 442 ; *Holbrook* v. *Holbrook*, 1 Pick. 250.) And a general subsequent clause will be construed by means of preceding clauses, and so as not to conflict with them. (*State* v. *Garthwaite*, 3 Zabr. 144 ; and see *McCartte* v. *Orphan Asylum*, 9 Cow. 507 ; *Commonwealth* v. *English*, 1 Bibb, 81 ; *United States* v. *Freeman*, 3 How. 566 ; *Williams* v. *Pritchard*, 4 T. R. 2.) In *Flynn* v. *Abbott* (16 Cal. 365) a repealing clause, general and absolute in its terms, was held to be limited by preceding special provisions of the act. In all cases, the intention of the Legislature must control, to be gathered from the language and subject of the whole act, even though contrary to the letter of a particular clause or sentence. (1 Kent's Com. *461, and cases cited ; *Tounele* v. *Hall*, 4 Comst. 144 ; *People* v. *Utica Insurance Co.*, 15 Johns. 380, per Thompson, C. J. ; *Jackson* v. *Collins*, 3 Cow. 95.)

The Legislature did not intend and could not have intended, by the clause of section twelve in the amendatory Act of 1861, to confirm the ordinance of 1852 of the trustees of Oakland, under which Mr. Carpentier seeks to make out his title. It certainly had no such intention with respect to so much of the ordinance as aims to transfer to him the legislative power of the town over the subject of wharves and wharfage for thirty-seven years. If not as to that there is no reason for supposing it had such intention with respect to so much of it as sought to grant away to him the entire water front. That property had originally been granted to the town by the Legislature in furtherance of the municipal legislative power over wharves and wharfage, and as accessory thereto. No intention in the Legislature being shown to take away or in any respect to impair the power, which was the principal thing, but on the contrary, a very marked purpose to confirm and maintain it in full force by successive statutes, there is no ground to infer an intention to divest the thing given as an accessory thereto and in furtherance of it. The same motives of public policy which induced the Legislature originally to unite in the same municipal body the

governmental power over wharves and wharfage with the proprietary control of the water front, existed in full force in 1861, to repel the presumption of any intention then to separate them. Especially when you have to base this presumption on a few general words of a general section of an amendatory act, the main scope and object of which are to regulate and confirm a system of municipal powers as an integral and important part of which the power in question is expressly reënacted, granted and confirmed to the city.

The circumstances under which Mr. Carpentier procured the passage of the amendatory Act of 1861 are also proper for consideration. It is sometimes supposed, because the distinction in the English Courts between public and private acts of Parliament for the purposes of pleading, does not exist to the same extent, if at all, in the United States, that therefore the distinction between them for every purpose is obliterated with us. This seems to me to be a grave error, not sustained either by principle or authority. On principle there is, and always must be, for all purposes of construction, validity, and general effect before the Courts, as between parties litigant, a very substantial difference between a legislative act affecting the whole or any class of the people, and one which concerns solely a private individual. The same motives of public policy and the higher reason of constitutional regulation and division of powers of government which forbade the attempt to set aside in judicial proceedings a legislative enactment of the former class, do not apply with the same, or indeed any force, to those of the latter class. Especially where the private act is in the nature of a conveyance, affecting, directly or indirectly, the rights of third parties, there seems no reason why the latter should be debarred from showing in any suit or proceeding where the act is relied on by the party who procured its passage that he did so, directly or indirectly, by improper practices, for which the like conveyance between private parties would be set aside by the Courts, or at least, the guilty party would be forbidden to claim any benefit therefrom. A private act of the Legislature has often been likened in the Courts to a conveyance; and in the sense in which I am now discussing that class of acts, there seems no good reason why

they should not be dealt with in the Courts as against third parties upon the same grounds. The distinction between public and private acts is sufficiently recognized by authority. (Dwarris' Statutes, *629, 690; *Catlin* v. *Jackson*, 8 Johns. *555; *Jackson* v. *Catlin*, 2 Id. *263.

It is no answer to say that the act here in question (the amendatory act of 1861) is a public, not a private Act. As I construe it, it is a public act throughout. Under the construction which appellants' counsel seek to fasten upon the clause of confirmation inserted into section twelve, that clause, as between Mr. Carpentier and the City of Oakland, is a private provision for his exclusive benefit, granting to him individually all that the ordinance of 1852 attempted to grant, and in respect of that clause the act is a private act. It is settled the same act may be both public and private, and there is no reason this should not be so. (Dwarris Stat. *630, and cases cited in note *m*. *Jackson* v. *Catlin*, 2 Johns. *263.)

Again, any ambiguity of legislative expression should be resolved in favor of public not of private interests. This rule must apply with the utmost force in the present case, where, as the findings show, a deception was practiced by Mr. Carpentier in respect of the clause in question, upon the member of the Legislature who introduced the act, and through him on the Legislature at large; and where, whatever be the legal effect of that fact, the ambiguity of the language of the clause is directly chargeable to Mr. Carpentier, who prepared the draft of the bill and had it introduced into the Legislature. Particularly where the effect of the construction now contended for by him is greatly to benefit his private interests at the expense of the city and people of Oakland and the public at large.

IV. The objection of the appellants to the complaint, that while it asks equity it does not offer to do equity, is not valid upon this appeal.

1. The principle invoked by the appellants, that the City of Oakland being before the Court asking equity, should have offered to do equity by tendering back to Mr. Carpentier his expenditures for wharves, school-houses, etc., is not, I submit, at all applicable to a case like the present. It is a rule only in cases where a plain-

tiff is in Court seeking to set aside some act or contract voidable, but not void, as for fraud, mistake, etc. ; or to rid himself of a liability otherwise valid, upon a ground which is against good conscience, and not favorably regarded in equity, as usury, gaming, etc.   Here our case is, that there never was a grant, contract, or act of any sort on the part of the town ; whatever might have been attempted by her unfaithful agents.   As already remarked, she was an artificial being, endowed by the law of her creation and existence with certain limited powers and functions, and utterly incapable of acting, or even of being, beyond or against these, to any intent or purpose whatever.   She has come into equity to have the Court declare the law upon this point for her protection against the claims of Mr. Carpentier, and to decree that these pretended grants, contracts, and proceedings were no acts of hers.   Is it possible she must be denied this clear justice because she has not tendered to Mr. Carpentier the large sums of money which, as he says, he has expended in " improvements " upon her property, under a claim of title thus set up by him ?   As well might it be said, if I give my agent a power of attorney to sell one of my lots in San Francisco but not any of the rest, and he attempts to convey all the rest to a third party well aware of this prohibition—which is, of course, to both of them the law of the transaction —that I shall not be heard in equity to ask for a decree setting aside the transaction and declaring the attempted conveyances null and void, without having first tendered to the unconscionable purchaser his large expenditure for improvements.   There is no such law and never was.

*D. P. & A. Barstow* and *H. P. Irving*, also for Respondent.

I.   The land in controversy was granted by the State to Oakland, not in fee, as so much property to enrich the town, but to enable the town to enjoy valuable franchises granted at the same time, and to execute important trusts, imposed for the benefit not only of the citizens of the town, but of the whole State as well. (*Hart* v. *Burnett*, 15 Cal. 590, *et seq.*   Previous decision in 13 Id. 540 ; *Minturn* v. *Larue*, 1 McAllister, 370 ; 23 How. 435.)

II.   The appellants contend that the bill should be dismissed

and judgment entered in their favor, because the respondent did not tender back the school-house and offer to pay for the wharves erected by them.

A sufficient answer is the fact, that this Court has already pronounced the complaint sufficient. It was demurred to on the ground, "that it did not state sufficient facts to show a cause of action." (13 Cal. 540.) This Court held that it did state sufficient facts. Had there been any conditions precedent upon which the right of action depended, the complaint would have been fatally defective in failing to show that those conditions had been satisfied. That there may be circumstances when a party who comes into a Court of Equity, asking to be relieved from a contract, may be required to tender money which he himself has received upon that contract we admit. But every case of this character that can be found in the books will be found to be a case where the plaintiff, who has received the money or property, asks the relief of a Court of Equity. The Court, in cases of this kind, may require of the party to do equity before he receives equity. This is not a case of that kind, but a case of a third party, a *cestui que trust*, asking relief against the fraudulent and illegal act of its trustees. The trustees who made this contract had no individual or personal rights in the franchise or property pretended to be ceded to Carpentier. It is the City of Oakland in its corporate capacity whose rights have been violated, and not those of the individuals composing the Board. If a trustee exceeds his power and pretends to convey property or rights which he has no power to convey, surely the *cestui que trust* has a right to come into a Court of Equity to set aside the conveyance, and is not bound to tender to the party contracting with his trustee the amount of any expenditures made on the property fraudulently or illegally conveyed. The appellant contracted with the trustees with full knowledge of their want of power to convey the property and franchises. Their power was defined by a public act. It is, therefore, absurd to contend that the City of Oakland should indemnify him from the consequences of his own illegal acts. He stands like any other individual who purchases property, or makes a contract with an agent who exceeds his powers.

III.  The appellants contend that by the Act of the Legislature, passed May 15th, 1861, the ordinances before mentioned were ratified and confirmed, from which a good and valid title to the property and rights in dispute accrued to them.

To this we answer—1st, that the Legislature in passing the said act did not ratify or confirm those ordinances of the Board of Trustees which were procured by fraud ; 2d, that the Legislature had not the power to ratify or confirm said ordinances, so as to give them an operation to affect injuriously the vested interests of the City of Oakland in her property rights and franchises ; 3d, that as to the property rights of the city the act in question is a private statute, the passage of which was obtained by fraudulent suggestions, and that a Court of Equity ought and will relieve against it where it interferes with vested rights.

1st.  In construing a statute, where the language is doubtful, the only fact to be ascertained is the intention of the Legislature in passing it.

In *Smith* v. *Randall* (6 Cal. 50) the Court says :  " The intention of the Legislature, where it can be ascertained, must govern in the construction of a statute.   This intention should not be taken from a particular section, but from the whole statute."   So in *People* v. *Roberts* (6 Cal. 216), and in *Ex parte Ellis* (11 Id. 223).  ·

In construing statutes, force and effect should be given to every part of them.   (*People* v. *Utica Ins. Co.*, 15 Johns. 358.)   And for the purpose of arriving at the legislative intent, all acts on the same subject matter are to be taken together and examined in order to arrive at the true result.   All acts *in pari materia* are to be taken together as if they were one law.   (Sedgwick, 247.)

Another rule is, that remedial statutes are to be construed largely and beneficially so as to advance the remedy.   (Sedgwick, 359.)   Again : that in construing a doubtful statute, the Court will consider the consequences resulting from a particular construction.   Apply now the foregoing rules of construction to the Act of May 15th, 1861.

The clause of the act which the appellants rely on as ratifying and making valid the ordinance in question, is contained in the

third section, and is in these words : " And the ordinances of the Board of Trustees of said town are hereby ratified and confirmed." There is no necessary connection between this clause and the other portions of the section. It stands alone, and we must resort to means outside of the context to ascertain its meaning.

On the fourth of May, 1852, the Legislature passed an act entitled " An Act to Incorporate the Town of Oakland, and to provide for the construction of Wharves thereat." The third section of that act gives the Board of Trustees of the town power, among other things, " to lay out, make, open, widen, regulate, and keep in repair all streets, roads, bridges, ferries, public places, and grounds, wharves, docks, piers, slips, etc. ; to regulate and collect wharfage and dockage, etc."

The Act of March 25th, 1854, entitled " An Act to Incorporate the City of Oakland," provides that the Common Council of the city shall have power, among other things, " to construct and keep in repair bridges, fences, public places, ferries, wharves, docks, piers, slips, etc., and to regulate and collect tolls, wharfage, dockage, and cranage upon all water crafts, and all goods landed," etc.

The Act of May 15th, 1861, provides that the Common Council shall have power " to construct and keep in repair bridges, fences, public places, ferries, wharves, docks, piers, slips, etc., and to regulate and collect tolls, wharfage, dockage, and cranage upon all water crafts, and all goods landed," etc.

The Act of April 24th, 1862, which repeals all the preceding acts, provides that the Common Council shall have power to " construct and keep in repair bridges, fences, public places, wharves, docks, ferries, piers, slips, etc., and to regulate and collect tolls, wharfage, dockage, and cranage upon all water crafts, and all goods landed," etc.

This power, given to the city at the time of its incorporation, has been regranted, in all subsequent acts, with such exactness that even an orthographical error which occurs in the first act has been repeated in all the others.

It appears by these acts that the Legislature considered the wharf privileges of very great importance to Oakland, almost surrounded as she is by the waters of the bay and creek, and from

first to last has renewed and confirmed the grant whenever laws have been passed rendering it proper to do so.

It is apparent from these facts that the Legislature never supposed that Oakland had conveyed to Carpentier all right to and control over those franchises, or the Act of April 24th, 1862, would not have contained the clause regranting the same to her. If the ratifying and confirming clause in section third of the Act of May 15th, 1861, had been designed to operate in the manner claimed by the appellants, the Legislature would not have passed an act the following year taking from Carpentier rights vested in him by virtue thereof, and giving them to the City of Oakland. Nor would the first section of that act regrant to the city all those wharf privileges if the Legislature intended to take them away by the third section of the same act. Nor would the Legislature, in the last clause of said third section, have given the Common Council power to " maintain suits in the proper Courts, to recover any right or interest or property which may have accrued to the town of Oakland," if it had intended to turn the plaintiff out of Court by the preceding clause of the same section. Besides, the third section is repugnant to the grant contained in the first, if their construction be the true one.

" Where a particular thing is given or limited in the preceding part of a statute, this shall not be taken away or altered by any subsequent general words of the same statute." (Smith, sec. 653.)

The Legislature cannot be presumed to do so absurd a thing as to make a solemn grant to a municipal corporation of powers vital to its well-being in one section of an act, and revoke the same in another section of the same act.

The Act of May 15th, 1861, was passed to confer on the City of Oakland enlarged powers for its government and welfare. The Act of 1854, to which it is amendatory and supplementary, was in some respects defective in its grant of powers, and those defects were intended to be obviated by the new act, whose design was to grant further privileges to the corporation, to increase its capacity for self-government, and to promote its general interests.

2d. The Legislature had not the power to ratify or confirm said ordinances so as to give them an operation to affect injuriously the

vested interests of the City of Oakland in her property rights and franchises. (3 Kent's Com. 565 ; *Dartmouth College* v. *Woodward*, 4 Whea. 518 ; *Benson* v. *The Mayor, etc., of New York*, 10 Barb. 242 ; *Grogan* v. *San Francisco*, 18 Cal. ; *Dash* v. *Van Kleeck*, 7 Johns. 502 ; *Lewis* v. *Brackenridge*, 1 Blackf. 220 ; *The Society, etc.* v. *Wheeler et al.*, 2 Gallison, 139.)

3d. The Act of 1861, as to that portion which relates to the ratification of said ordinances, so far as it is intended to affect injuriously the vested rights of Oakland in her property or franchises, is a private statute, (*Smith* v. *Morse*, 2 Cal. 546 ; Sedg. 32, note 1 ; Kent's Com. 506 ; 1 Blackf. 86, note 21) the passage of which was obtained by Carpentier by fraudulent suggestions without the knowledge or consent of Oakland, and ought to be relieved against by a Court of Equity. (*Catlin* v. *Jackson*, 8 Johns. 554.)

*Heydenfeldt*, for Appellants, in reply.

I. In regard to the power of the City of Oakland to make the grant in question, the respondent's argument makes no distinction between the grant of the lands and the grant of the franchise. These are essentially different and must be so treated. In the act granting the lands to the city, the power of disposing of them is given in its largest terms. But it is assumed that all the lands could not be granted without defeating the power to erect wharves, for it is asked what right would the town have to build wharves on the land of another.

We have several answers : 1st. All the land did not pass by the grant, because that portion which would be the protractions of the streets were, by the plan of the city, dedicated to public use, as was decided by this Court in *Wood* v. *San Francisco* (4 Cal.)

2d. The city might reacquire by purchase, if necessary, any portion of the water front, and thus exercise her power of erecting wharves.

3d. At the termination of the lease to Carpentier she would again resume full control of the whole subject matter.

4th. It would be absurd to imagine that all the land was necessary for the purpose of wharves ; the respondent says there are nine thousand acres. Now not only the quantity, but the power

given to dispose of them would contradict the assumption of any such necessity.

That the grant and the power to dispose of these lands constitutes them absolute property in the town, free from any trust, was fully settled by this Court in the case of *Holliday* v. *Frisbie* (15 Cal. 630).

The City of Oakland had the title to the wharf franchise, but it is said there was a public trust connected with the title, and therefore she could not lease the franchise. Why not? In all parts of the world these franchises are in the hands of private individuals and dealt with for the purpose of trade and profit. If the city retained the immediate control, she would have to deal with them by the hands of individual agents, then why not by the hands of an accountable lessee? The term of lease is not a long or unreasonable one in the lifetime of a municipal corporation, and particularly of a town whose existence had just commenced, which then used the only possible means in its power to carry into effect and exercise the trust confided to her. But if there be any doubt as to the power of the corporation to lease the franchise, then that doubt is dispelled by the confirmatory Act of 1861.

II. Against our proposition, that there was no offer on the part of plaintiff to do equity by tendering back the expenditures of the defendant, the respondent rests upon the previous opinion of this Court, overruling the demurrer.

To this we answer—1st, that the question was not argued on the demurrer, or brought to the notice of the Court; 2d, that after demurrer, and at all times and in any Court, it is perfectly allowable to move to dismiss the bill for want of equity.

III. It is insisted by respondent that the Act of the Legislature of May 15th, 1861, did not confirm the ordinances in question. Their citation of authorities as to the construction of statutes is vain and inapposite. They seem to have forgotten the rule, which holds that what is plain and unambiguous is not the subject of construction. The act says "the ordinances are confirmed." Can the Court say that some ordinance is not confirmed? Has the Court power to go behind and against the words used by the Legislature, so as to determine that the Legislature did not intend what it said it intended?

It is also urged that the Legislature had not the power to confirm. Under this Act of 1861 we claim only the ratification of the lease of the wharves. This has already in this case been decided to be a public trust, or in the language of the Court in *Hart* v. *Burnett*, a public trust connected with the title—the title being in the city. The only difference is, that in the one case the property was land, in this a franchise; both are alike property, subject to ownership. Then the power of the Legislature over all municipal property wherewith a public trust is connected has been settled by this Court. (*Payne & Dewey* v. *Treadwell*, 16 Cal. 225; *San Francisco* v. *Beideman*, 17 Id. 443; *Hart* v. *Burnett*, 15 Id. 616.)

IV. It is said that the Act of 1861, so far as it ratifies the ordinances in favor of Carpentier, must be treated as a private act, and can therefore be relieved against in a Court of Equity, and various authorities are cited to sustain this proposition. If the Court will examine the authorities, it will find that all the cases rest upon the fact that the interests of third persons are affected, and that consequently the Court gives relief. In England the Courts of Equity, as they term it, relieve against it, at least there have been two or three cases of the kind. In the United States the same decision would be made, on the ground that the Legislature had no power to take away the property of one private individual and give it to another; the law would be deemed invalid because unconstitutional. But here we are dealing with a municipal government, which is created and can be destroyed by the legislative breath; which can be reformed, remodeled, reorganized, limited, and constrained, or enlarged and liberated; its powers taken away, or compelled to the exercise of much vaster powers than it has—all at the beck and nod of the legislative will.

Here, then, on this subject of public trust, this wharf franchise of the municipal corporation, the Legislature has exercised its will and power and no one can gainsay it.

FIELD, C. J. delivered the opinion of the Court—COPE, J. and NORTON, J. concurring.

By an act of the Legislature, passed May 4th, 1852, the town

of Oakland was created a municipal corporation, the corporate powers being vested in a Board of Trustees, consisting of five members, to be elected on the second Monday of May of each year. By the third section of the act the Trustees were clothed with certain powers in relation to wharves, piers, and docks; and with a view to facilitate the construction of wharves and other improvements, the town was invested with the title to lands within the corporate limits lying between high tide and the ship channel of the bay of San Francisco. On the second Monday of the same month, pursuant to the act of incorporation, an election was held, and five Trustees were chosen. Of these only four ever qualified; and at a meeting of the Trustees, consisting of this number, an ordinance was passed granting, in its first section, to the defendant, Horace W. Carpentier, and his legal representatives, for the period of thirty-seven years, the exclusive right and privilege of constructing wharves, piers, and docks, at any points within the corporate limits of the town, with the right of collecting wharfage and dockage at such rates as he might deem reasonable, subject to certain provisions as to the erection of particular wharves, and the payment to the town of a certain per centage of the receipts of the wharfage; and granting to him, in its second section, with a view, as expressed therein, the more speedily to carry out the intentions and purposes of the act of incorporation, and in consideration of a contract on his part to build a public school-house for the town, all the land lying within the corporate limits between high tide and the ship channel. The ordinance also charged the President of the Board of Trustees with the duty of executing, on behalf of the town, a grant or conveyance to Carpentier, in accordance with its provisions. Under this ordinance the President executed to Carpentier the grant or conveyance designated, reciting in the instrument the authority under which he acted.

In May, 1853, at the second election under the act of incorporation, five Trustees were again elected, and of them also only four ever qualified. The Board, consisting of the four who qualified, by an ordinance, passed in August, 1853, ratified and confirmed the ordinance of the previous Board, reciting that the consideration, upon which such previous ordinance had been passed, had been " in

chief satisfactorily paid and performed," and also regranted to Carpentier and his legal representatives the water front of the town, with the right to erect wharves, piers, and docks, and buildings, at any and all points thereon not obstructing navigation.

By an act of the Legislature, passed March 25th, 1854, a municipal corporation by the name of the " City of Oakland " was created, and invested with all the rights, claims, and privileges, and subjected to all the obligations and liabilities of the " Town of Oakland." The present suit is brought by the new corporation, and its object is to set aside and cancel the grant or conveyance to Carpentier, and enforce a surrender of the interests and property transferred or claimed to be transferred thereby.

The suit is, of course, for equitable relief, and the grounds alleged for the interposition of equity are that the grant or conveyance was obtained by fraud on the part of Carpentier, and was made without authority on the part of the Trustees, and that it constitutes a cloud upon the title of the city, and embarrasses her in the exercise of her legitimate functions.

The fraud alleged is that Carpentier obtained the act incorporating the town of Oakland without the consent or knowledge of the people of the town, and for the purpose of acquiring the franchises and lands subsequently granted to him ; that at the election held under the act of incorporation he procured the election of himself and " partners in land speculations " as members of the Board of Trustees, and declined to qualify himself, in order to remove a legal obstacle to his obtaining the grant in question ; and that the conveyance to him by the President of the Board was, according to an understanding with the Board, to be executed upon the delivery of a bond to reconvey the franchises and lands to the town when requested, but that it was obtained without such bond, upon representations that it was important to the interests of the town that it should be executed at once, in order to be filed before the Board of Land Commissioners, then in session, and that he would give the bond at some future period. No matters are stated in support of the allegation that he " fraudulently procured the election of his tools and agents " in the year 1853, when the confirmation of the ordinance was obtained. It is very evident that the matters thus

alleged, in order to taint and vitiate the ordinances of the Board of Trustees and defeat the grant to Carpentier, are on their face too vague and general to merit serious consideration.   It is of no consequence whether the act of incorporation was procured with or without the knowledge of the people of Oakland.   The validity of the public acts of the Legislature is in no respect impaired by the knowledge or ignorance of the parties who may be affected by their operation.   And the general charges referring to the election of members of the Board of 1852 and of 1853, so far as the complaint is concerned, rest in mere averment.   And in relation to the bond for reconveyance, which it is alleged Carpentier, by an understanding with the Board, was to execute, it is sufficient to observe that the ordinance itself, to which the complaint refers, negatives any understanding of the kind.   The allegations of the complaint are, as a whole, of so vague and indefinite a character that no relief can be based thereon.   When the case was here upon the demurrer to the complaint, the Court observed that the alleged fraudulent practices of Carpentier, in procuring the election of the first, or of the second Board, or the promises or agreements made to induce the execution and delivery of the conveyance from the President, were not fully set out; but as the complaint might be amended on the return of the cause in these particulars, it proceeded to consider the general questions discussed by counsel.   It is sufficient to say that the complaint was not amended ; and aside from this consideration, the answer fully meets and denies the charges of fraud or fraudulent intent in the acts of Carpentier ; and what is of more consequence, the charges are wholly unsustained by the proofs.

Stripped of the charges of fraud the whole claim for equitable relief falls to the ground.   The grant was either valid, or void, or voidable.   If void, as contended by the counsel of the respondent, there can be no occasion for the interference of a Court of Equity. If void, the condition of things—of the rights, privileges, and estate of the city—remains as though no transfer had been attempted. No cloud is cast upon her title, and no embarrassment can attend the exercise of her legitimate functions.   She has only to proceed and assert her privileges and claim her interests, and whoever interferes with them will be a trespasser.   If, however, the grant

43

is only voidable, and not void, the plaintiff seeking the aid of a Court of Equity can only obtain equity by doing equity—that is, she can only obtain relief from the acts of the agents of the town, by tendering compensation to the defendant, who has relied upon them, for his expenditures. One of the counsel of the plaintiff, in a brief, exhibiting ability and learning, takes the same position in answer to the defendant, who urges this principle against the relief prayed. "The principle invoked," says the counsel, "is not applicable to a case like the present. It is a rule only in cases where a plaintiff is in Court seeking to set aside some act or contract voidable, but not void, as for fraud, mistake, etc. ; or to rid himself of a liability, otherwise valid, upon a ground which is against good conscience, and not favorably regarded in equity, as usury, gaming, etc. Here our case is that there never was a grant, contract, or act, of any sort, on the part of the town, whatever might have been attempted by her unfaithful agents. As already remarked, she was an artificial being, endowed by the law of her creation and existence with certain limited powers and functions, and utterly incapable of acting or even of being beyond or against these, to any intent or purpose whatever."

The conclusion which follows from the views we have expressed is evident. The charges of fraud, as a ground for the equitable interposition of the Court, are fully answered, and must be left out of the case. If the ordinances of the Board, granting the franchises and lands to Carpentier, are void, there is no occasion for the interference of equity. If they are only voidable, that interference cannot be invoked until equity is done by the party claiming it—that is, by placing or offering to place the party relying upon the acts of the agents of the town in the same position which he would have occupied but for his reliance upon their validity. These views dispose of the case, and render it unnecessary to consider the other points made by the appellants.

The judgment of the Court below must therefore be reversed, and that Court directed to dismiss the suit, and it is so ordered.

Oakland *v.* Carpentier.

The plaintiff filed a petition for a rehearing, upon which NORTON, J. delivered the opinion of the Court—COPE, C. J.* concurring.

The plaintiff asks a rehearing in this case, upon the ground that when the case was before this Court on a former occasion it was decided: first, that the action could be sustained without an offer by the plaintiff to do equity ; and, second, that although the transfer to the defendant was void, it was a proper case to ask the transfer to be set aside by the equity powers of the Court, and that these decisions have become the law of the case, and cannot now be reversed.

In the former decision the complaint was held to be sufficient, upon the ground that the transfer was absolutely void. Nothing was said as to whether it would have been sufficient without an offer to do equity, if the Court had considered the transfer not void, but only voidable. Afterwards the opinion was modified, by reserving for future revision the question of the validity of the contract with Carpentier. This was a reservation of the whole question as to its validity, as well whether it was voidable as whether it was void. The question whether or not the transfer was voidable being thus withdrawn, no decision can be inferred as to what would have been necessary to render the complaint sufficient, in case the Court should consider the transfer only voidable.

It may be argued that when this question was withdrawn from the opinion, there was no ground specified in the opinion upon which the decision was made ; but if this may be so, it does not follow that the decision necessarily involves a determination of a question which was not only not mentioned, but the basis for which was withdrawn from the opinion ; and so, although it was said in that opinion that it was a proper case for equitable relief, considering the transfer absolutely void, yet when the ruling that the transfer was void was withdrawn from the opinion, the remark that it was a proper case for equitable relief became merely *obiter*, and

---

* Mr. FIELD having been appointed an Associate Justice of the Supreme Court of the United States resigned the office of Chief Justice May 20th, 1863.  Mr. COPE succeeded him as Chief Justice.  The opinion on the rehearing was not filed until June following.

decided nothing. At most, it could be considered as only saying what would be the opinion of the Court in case, upon a revision of the question on some future occasion, the Court should hold the transfer void.

Rehearing denied.