‘Nott, J.,
delivered the opinion of the court :
This is an action brought to recover #2,000,000, together with certain unliquidated damages, being for the military occupation of the claimant’s land by the defendants. The facts are as follows :
In July, 1850, George W. Johnson, a young man between eighteen and nineteen years of age, settled upon a half-section or 320 acres of unoccupied public lands in the Territory of Oregon, on the northern bank of the Columbia river. The tract had been chosen for him by his father with rare sagacity, for it was situated at the foot of the Cascades and at the head of ocean navigation, while it embraced *408 tlie only level ground near tlie portage not subjected to overflow, and covered the only route for a railway among tlie mountains which there rise from the waters of the river.
“ In the summer of 1850, after his arrival there,” says an unusually intelligent witness, “Mr. Johnson erected a zinc building, which had been brought from San Francisco, and commenced clearing off a piece of land, procuring rails for the purpose of enclosing a lot of ground for agricultural purposes. During that season and the next he put under cultivation several acres of land, erected a corral, planted fruit trees, and made other improvements towards making a residence and home. In the spring of 1853 he erected a two-story frame building, with an L attached. This building he occupied as a store and hotel.”
The claimant continued to reside upon and cultivate the tract, so that in the spring of 1856 “ he had,” in the words of another witness, “ a fine orchard, I judge, of one hundred and fifty trees, and an enclosure for a garden for vegetables, &c., another enclosure of about six or eight acres arranged for stock, which was the most profitable use it could he put to, and a good range for cattle. He also raised potatoes for sale.”
But the claimant had also built up the business of his store and hotel so that it yielded him $3,000 fer annum, and had made himself a partner in a transportation company, whose business during that year paid to him $5,000. By this time the tract had become of great supposed value as the site of a future town, and as the terminus of a projected railway.
In April, 1856, the brilliant prospects of the claimant were ended, and a long train of disappointments and troubles, reaching to the present time, began. The Indians, then in a state of armed hostility to the United States, burnt and destroyed his buildings, “ leaving only the floating wharf boat with the -warehouse attached,” and during the latter part of the same month the forces of the United States arrived to take possession of his entire tract, and hold it from that time as a military reservation. When this action was commenced that military occupancy had not ceased, nor had the claimant received from the government any remuneration for his loss.
But the losses of the claimant went still further. The transportation business at the portage of the Cascades was controlled and owned by two persons, of which the claimant was one. His tract, which furnished both the route and the depot for the business on the north side of the Columbia, was regarded by his partner as his capital. *409 When it was lost to the claimant his share in the transportation company went with it.
The claim has been twice investigated during the seven years that have elapsed since the occupation of the defendants began — once by a military board, sitting by order of General Harney, then commanding the depaitment of Oregon, andonee by the surveyor general of Washington Territory, acting under the authority of a resolution of the House of Representatives; but nothing has ever been paid to the claimant. It is perhaps needless to say that neither of these investigations conclude this court.
At the time when the defendants entered upon the tract, the claimant had given to the surveyor general of Oregon the “notification of settlement on •public lands not yet surveyed” required by the act 14th February, 1853, (10 Stat. L., 158,) and he had resided upon and cultiva!ed the tract for four years, as required by the “ donation act,” 27th September, 1850, (9 Stat. L., p. 496;) but he had not received a patent from the General Land Office, nor had the register and receiver of public lands in the Territory certified to the Commissioner of the Land Office the facts entitling him to a patent, nor had he made final proof of his continued residence as required by the act. His title, therefore, at the time of the defendant’s entry, rested entirely upon his four years’ continued residence and cultivation, and previous notification. Since that time and before the bringing of this action the claimant has made final proof to the satisfaction of the register and receiver, and they have transmitted the proper certificate to the Com missioner of the General Land Office; but the commissioner has refused to issue a patent, alleging that the government had a right to make a military reservation of the tract, and that the claimant is entitled only to the value of his improvements, to be ascertained by the Secretary of War. This brings up the intent and meaning of the donation act, and involves an examination and construction of that statute on which the claimant’s rights depend.
The fourth section of the act of 27th September, 1850, provided for two classes of donees : 1st, for those who were already “ occupants” of public land in Oregon; and second, for those settlers who might become residents within the Territory before the first day of December next ensuing. The grant is specifically pledged to those “ who shall have resided upon and cultivated the same for four consecutive years,” and is not confined to -those “who shall” thereafter reside and cultivate. The act goes further and provides that where “ married persons have complied with the provisions of this act, so as to entitle them to *410 the grant as above provided, whether under the late provisional government of Oregon or since,” and either shall have died, the survivor shall be entitled to his share equally with the children, so that there can be no possible doubt that the donations were for the benefit of those who had already settled, as well as for those who might thereafter avail themselves of the benefits of the act.
There then being these two classes of beneficiaries created by the fourth section, the fourteenth section provides “ that such portions of the public lands as may he designated under the authotity of the President of the United States for forts, magazines, arsenals, dock-yards, and other needful public uses, shall be reserved and excepted from the operation of this act.” If the act had stopped there it is evident that those settlers who had already made improvements on lands which should be 11 designated under the authority of the President” for forts and other public uses, would lose their work and be left without redress. The act therefore goes further and says : “ Provided, That if it shall be deemed necessary, in the judgment of the President, to include in any such reservation the improvements of any settler, made previous to the passage of this act, it shall, in such case, be the duty of the Secretary of War to cause the value of such improvements to be ascertained, and the amount so ascertained shall be paid to the party entitled thereto.” The latter part of the section was therefore not a restraining, hut an enabling act, providing compensation for those who had settled upon the public lands without procuring a title, and who at common law were intruders making improvements in their own wrong upon the estate of another.,
It seems to have been supposed by Congress that the lands to be reserved for public uses would be designated by the President immediately after the passage of the act. At any rate no provision was made for reimbursing those settlers who should thereafter settle upon lands which should subsequently be reserved for public uses, and it was left questionable whether the right to reserve could be defeated by the instantaneous entry and occupation of a settler, or whether the reservation by the government would oust the settler from his inchoate estate, and leave him without remuneration for the improvements he had made upon the faith of this donation act. Accordingly this omission seems to have been provided for by the ninth section of the act 14 February, 1853, (10 Stat. L., p. 158,) which first enacts : “ That all reservations heretofore as well as hereafter made in pursuance, of the fourteenth section of the act, to which this is an amendment,” shall be limited to certain specified amounts; and then adds, “ Provided, *411 That if it shall be deemed necessary, in the judgment of theDresident, to include in any such reservation the improvements of any settler made previous to such reservation, it shall, in such case, be the duty of the Secretary of War to cause the value of such improvements to be ascertained,” &e., as before enacted. This section was therefore in the strictest sense in pari materia with the fourteenth section of the previous act; and instead of being intended as a perpetual limitation or condition running with the land, was a part of the same beneficent design which inspired the act of 1850. In other words, this proviso was not intended to impose, upon the fee to be granted to the settler, a perpetual right of re-entry on the part of the government, but to secure him from loss or injury by reason of the omission already pointed out.
Such being our construction of the act, the question arises, When does, this right of reservation cease; or when does the settler acquire an ownership and title under the law ? The Supreme Court has answered the question in the case of The United States v. Fitzgerald, 15 Peters, 407, where it is held that a petitory action (in the nature of ejectment) could not be maintained against a pre-emptioner who had made proof of his possession according to law and paid the purchase money, but from whom the Secretary of the Treasury had withheld a patent; and where the court expressly says: “ no reservation or appropriation of the land, made after the right of the defendants accrued under the act 17 June, 1834, could defeat that right.”
A distinction has been suggested between the case of Fitzgerald and the case at bar. The decision of the Supreme Court related to the aet 29 May, 1830, (4 Stat. L, p. 420,) which was a pre-emption act, and exacted money from the settler; whereas under the Oregon act no money was exacted, and the grant was termed a donation. But there are several reasons for holding that, under the Oregon or “donation aet,” the settler acquired an equitable title by virtue of his four years’ residence and cultivation, and for saying that the decision of the Supreme Court is decisive and obligatory here.
In the first place the payment of money was only a part of the consideration given by the grantee under the pre-emption acts. There, as here, he was required to occupy and cultivate; there the grant was restricted to even a smaller tract than was here given, and the policy and chief end of the statute, as of this, was to foster the advance of civilization into the uninhabited and useless portion of the national domain. The “donation act” was only an advance on the same line of national policy, and the patent which it promised was not a naked gift, but a grant upon a present consideration, received and accepted *412 by the grantor. This consideration was just as valid and binding upon the government as the other; for in the eye of the law services are as sufficient a consideration to support a grant as money, or as services and money.
In the second place tile statute does not provide in terms that the final proof of residence shall he a condition precedent to ownership or limit the time within which such proof may be made. On the contrary, it expressly provides (section 7) that after the settler has proved to the satisfaction of the surveyor general that the settlement and cultivation required by the act “had been commenced,” he may prove, “in like manner, by two disinterested witnesses, the fact of continued residence and cultivation,” at any time a¡fter the expiration of four years from the date of such settlement” With respect to the proof that the settlement and cultivation “had been commenced,” this latitude did not exist; for there the statute required the proof should he made within twelve months from the time of the survey or from the time of the settlement. The statute, therefore, seems to treat the four years’ residence and cultivation as a full compliance with the conditions to the grant, and the final proofs, the certificate of the surveyor general and the patent of the Commissioner, as the muniments of the legal title.
In the third place, the statute provides, (section 8 :) “ that upon the death of any settler before the expiration of the four years' continued possession, all the rights of the deceased shall descend to the heirs at law,” hut it makes no provision for those settlers who should die after “ the four years’ continued possession,” and before a patent should have issued or other steps been taken. It could not have been intended to provide for the descent of an inchoate right in the one case, and to withhold it in the other. Hence Congress must have regarded the rights of the settler who had completed his period of possession as complete, needing no statutory aid, and descending like other estates in land to the proper heirs who might present the final proofs and receive the patent.
In the fourth place, the amendatory act of 1853, section 8, in like manner provides that in case of the death of a widow, “prior to the expiration of the four years’ continued possession,” all of her rights shall “inure unto and be vested m her heirs at law,” while, in like manner, it makes no provision to preserve and transmit her rights; after the'expiration of “the four years’ continued possession;” and before the final proof should be made or the patent be received.
In the fifth place, the act of 1850, section 4, declared all future contracts for the sale of land, before the settler had received a patent *413 tlierefor, void, leaving him thereby with an estate or interest in realty, which he might devise, but could not alienate. But by the act July 17, 1854, (10 Stat. L., p. 305, sec. 2,) Congress removed this restriction upon alienation by repealing the provision in the act of 1850, with an express proviso that no sale should be valid unless the vendor should have resided four years upon the land, and thereby made these estates or interests alienable as they had previously been heritable.
In the sixth place, the act of 1850, section 9, also provides that no claim to a donation right shall attach to any tract or parcel of land reserved for governmental purposes, “unless the residence and cultivation thereof shall have commenced previous to the selection or reservation of the same for such 'purposes,” by which the statute seems to recognize the precise construction that we here to give to its general provisions, and to authorize and legalize a claim where the occupation of the settler was prior, in time, to the reservation of the government.
But, in addition to the legal conclusion which we here reach, we are of the opinion that, as a matter of fact, no military reservation was ever made or intended to bo made by the government; nor has the government yet determined whether it will continue the occupation that at present exists. That occupation was commenced by a military officer engaged in the petty Indian hostilities that existed in Oregon in 1856, without the knowledge of the President, the Secretary o? War, or any high officer of the government. The story of its occupation is briefly detailed by General Wright, commanding the department of the Pacific, and is as follows :
“ In the spring of 1856, when I was in command of the United States troops operating against hostile Indians in Oregon and Washington Territorios, I found it necessary, to preserve my line of communication, to establish a garrison on the Washington side of the Columbia river, at the foot of the Cascades. ■ A small reservation was laid off, and block-houses erected. The post thus established, and known as Fort Cascades, was occupied until 1861, when the troops were temporarily withdrawn and the buildings and grounds placed under charge of an agent of the Quartermaster department.”
Up to the time of the commencement of this action there is nothing to show that the subject of this reservation ever received a thought from the President, or from any officer authorized to speak for him. There are, indeed, certain documents printed in the record, consisting of communications and reports from officers in the War Department, which may indicate, if not establish, a recent determination of the Secretary of War to retain the post at the Cascades and make it perma *414 nent; but this determination, if it exists, and all of the communications which indicate it, are subsequent to the bringing of this action. The claimant’s case, once instituted, cannot be defeated by any subsequent act of the defendants or their officers, and we, therefore, reject all of these documents as irrelevant. When they are rejected there is no evidence to show that this portion of the public lands was ever designated under the authority of the President for any public use ; and there is the most satisfactory evidence to show that it was not.
These are the grounds upon which, in the opinion of the court, the defence must rest. The learned Deputy Solicitor has, indeed, addressed to the court an argument replete with authorities and legal erudition to show that, instead of there being an “ illegal or inequitable ousting of George W. Johnson by the United States, he was himself an intruder ah initio on these •portages, and the lands thereon taken in fraud of law and against public right.” This argument shows, by the ordinance of 1787, “ the carrying places between the Mississippi and the St. Lawrence to he common highways and forever free, as well for the inhabitants of said Territory as to the citizens of the United States and those of any other States that may be admitted into the confederacy, without any tax, impost, or duty therefor,” and that the act organizing the Territory of Oregon provided that “ the inhabitants of said Territory shall be entitled to enjoy all and singular the rights, privileges, and advantages granted and secured to the people of the United States northwest of the river Ohio by the articles of compact contained in the ordinance for the government of said Territory, on the 13th day of July, 1787, and shall be subject to all the conditions, restrictions, and prohibitions in said articles of contract imposed upon the people of said Territory.” (9 Stat., 323.)
The argument then contends that the claim “ set aside and nullified the supreme law of the land by weakening the provisions of the treaty of limits westward of the Rocky mountains between the United States of America and the British government, concluded June 15th and proclaimed 5th August, 1S46, by thesecond article of which the Columbia river, from a certain point down the main stream to the ocean, was declared to be free and open.” And it insists that the occupation of the claimant “ was a direct interference with the possessory rights of the Indian tribes on and near these portages, whose titles have not yet been extinguished by the treaty arrangements so generally made with other Indians almost everywhere else in Oregon and the Territory of Washington.” And finally, that this intrusion of the claimant upon *415 these carrying places at the lower Cascades of the Columbia was a pur-presture.
We aie of the opinion that the most of these objections are objections which might be possessed of great power if addressed to the legislative authority, hut that when addressed to a judicial body they are necessarily overridden and destroyed by the clear terms of the “ donation act.” The last objection, indeed, would have great force if the claimant had attempted to exact a royalty for the use of the portage at the Cascades. But the defence taken by the learned Deputy Solicitor is not the defence taken by the government; and when the government has so long resisted the claimant clearly upon other grounds— has held out to him inducements for a settlement — has received the consideration required by law for a grant, and has otherwise treated him as a lawful settler, this objection that he was an intruder upon the portages cannot be interposed now.
When the right of the claimant to recover is established, it becomes a question of some doubt and interest as to what is the nature of his action and what should be the measure of his damages. Both by the prayer of his petition and the argument of his counsel he has treated the entry of the government as a trespass upon his land; and he has also given evidence of certain arbitrary and unnecessary acts of one of the military commanders, as apparently an aggravation of his damages. To any one familiar with the decisions of this court it is needless to say that here the claimant has mistaken his rights. This court has again and again held to the principle of the common law that the government cannot be sued in actions sounding in tort, nor made liable for the tortious acts of its officers. If a military officer left the path of his official duty to vex or oppress the claimant, he thereby became liable to the claimant, and might have been sued like all ministerial officers.
But the court has also held to the principle of the common law that the republic does no wrong, and to the provision of the Constitution, “ nor shall private property he taken for public use without just com-pensationand, by virtue of these, it always has been- held that a party might recover upon the implied contract as though the property had been acquired under an agreement of purchase, leaving the price undetermined.
.Regarding this, then, as an action.on an implied contract, we must determine what it is which the government has taken. The claimant has given evidence of the value of the fee, and insists that it is the measure of his damages. The court is of a different opinion. We *416 think that there is nothing to show such an intent on the part of the government or to establish anything beyond the temporary occupation already pointed out. We therefore think that the measure of the damages most be limited to the value of this temporary occupancy, as though''Jhe"'claimant_had leased and the government had rentecL.the premises, regard being paid to the nature of the occupancy and to the fact that the government had the option of discontinuing the implied tenancy on any day or of retaining it indefinitely. This also is the rule which courts have adopted as the measures of damages in actions for mesne profits, and the only rule which ‘can be made applicable to the case. We therefore must assume that at the time of the entry upon the premises the claimant was willing to lease and the government was willing to rent the premises with the rights and privileges and upon the conditions before enumerated at the fair or market value of an annual rent; and we must regard the claimant as bringing his action to recover this rent for the seven years_preceding the commencement „of his notion. The 'amount thus found may be regarded in futui e as the established and agreed rent of the premises so long as the government shall elect to occupy under the implied lease. What the value of this annual rent was in 1856 we will now proceed to inquire.
The tract, as has been said, consists of 320 acres, and has a frontage on the river of 61 chains and 15 links. The same intelligent witness who has before been quoted, (Daniel F. Bradford,) thus describes it:
“ The land claimed by Mr. Jolmson is situated on the Columbia river, about 160 miles from its mouth, at what is known as the Cascades of the Columbia, being the head of ship navigation. It has a water front of one-half mile on the liver, running back so as to take in 320 acres of land. I have traced the lines on the upper and lower sides until it reached the mountains, but have never been on the back line or the corners in the mountain. The interval of land between the mountains and the river, being the flat part of Mr. J ohn-son’s claim, embraces about three-eighths of the whole. It is nearly half a mile from the river to the mountain. On the river front of this claim, excepting a few hundred feet on the west line, is a bold bank above the high waters of the spring and summer freshets. Being at the foot of the rapids, the river makes a current or eddy up stream beyond the tail of the rapids, making it a safe and commodious landing for vessels and steamboats, the river at this place being not far from three-quarters of a mile in width. About three-eighths of the claim lying on the river, as above described, is a level plateau; the balance is broken and mountainous. The level portion, as before described, *417 is good, arable land, and all fine pasturage — I mean the whole claim is fine pasturage. The foot-hills at this point rise gradually into the mountains.”
Under the resolution of the House of Representatives, passed 11th February, 1861, James Tilton, surveyor general of Washington Territory, estimated the claimant’s damages; and on the 9th September, 1861, reports : “I find it difficult to estimate the amount of damages from these elements ; but from a residence of over seven years in the Territory, and a knowledge of the increase of population, and the fact that the Cascades of the Columbia are the best portage between the ocean and the vast interior, I know of no tract of land in Washington Territory which possesses such natural advantages for trade and commerce as the claim of George W. Johnson. I therefore estimate the amount of damages sustained by the said George W. Johnson, by the occupation of his donation claim at the Cascades, at $120,000.”
The father of the claimant testifies : “The annual rent would have been worth $20,000 in 1856.” He also says: “One man, named Foster, wanted to purchase three blocks. * * * He was willing to pay $2,000 for one block; the others he wanted for a less price. The blocks were to be 200 feet square. * * * Later, near the time the military took the land, the claimant let one acre, about 75 rods from the steamboat landing, to a firm named Wilson & Hamilton, for which they were -to pay a monthly rent, at the rate of $625 per annum. They had paid two or three months’ rent when the military took possession.”
Bradford, the vice-president of the Oregon Steam Navigation Company, and the owner of a similar though less valuable claim above the Cascades, and the former partner of the claimant, testifies : “ The amount paid me by the company for the rights conveyed to them on the Cascades, including the royalty, as above stated, has already amounted to over $200,000 in coin. My price was $100,000 in cash for these privileges, but the company preferred to give me $20,000 in cash, and the royalty for five years, which has already yielded me more than $200,000, as before stated.”
Apart from these profits, derived from a business of which his land was the substantial capital, Bradford testifies to the value of the land itself as follows: “,The actual value of that property of Mr. Johnson in 1856, before it was occupied by the military, was not less than $100,000. I base that sum upon applications and offers which had been made to me for portions of my claim and his. I testified in 1861 in this case that the prospective value of Mr. Johnson’s claim was *418 not less than $300,000, and the rapid settlement of the upper country fully confirms the testimony I gave at that time. In August, 1859, J was authorized by capitalists in the city of Boston, in connection with myself, to offer Mr. Johnson $10,000 for one-half acre of land on Mr. Johnson’s claim that I might select, provided the government would release the land. I made the offer in good faith, and left it open six months for him to obtain the release from government.”
The only remaining witness whose testimony is valuable to show the actual market value of the property is Charles M. Carter, a lawyer residing in Portland, Oregon; and he says that he cannot make a definite estimate, but that if it had been his, he would not have taken $200,000 for it, though he might not have given that amount.
The evidence produced by the defendants goes to the opposite extreme. The strongest and best informed witness produced on their behalf is Chief Justice Williams, of Oregon. He testifies that he was attorney for the Oregon Steam Navigation Company, from its organization up to 1863, and in that capacity had much to do with the transaction of their business about the Cascades; that he has knowledge of the value of lands on the opposite side of the river; that an entire claim was purchased by one Ruckel for $8,000 ; that for parts of other claims he paid $4,000 or $5,000 more; that on the Washington side of the river the company purchased eighty acres for $800; that there were sales of other parcels, varying from $1,000 to $5,000 each; that he drew a deed to the company from one Bishop, the consideration of which was not more than $2,000 ; and he finally says : “I have heretofore expressed the opinion, and still entertain it — derived from my knowledge of the value of lands in Oregon and Washington — that Johnson’s claim, prior to I860, was not worth more than ten thousand dollars.”
But the witness does not show the particular locality or characteristics of the various lots referred to, nor does he deny the assertion of the claimant’s witnesses, that the Johnson and Bradford claims embraced nearly all the level land on that side of the river, and that the mountain land was nearly valueless for any purpose.
The next strongest witness for the defendants is General Ingalls, chief quartermaster in Oregon, and a member of a military board appointed to investigate the value of this very property in 1860. He testifies : “ I had an ample opportunity to know the value of Johnson’s claim, and am now of the opinion that no man could have been found in 1860 who would have really gtven $10,000 for his claim. In my own private opinion it was not worth two-thirds of that sum.”
*419 The next witness in importance is Inspector General Hardie, who was in command at Fort Cascades three years after the military occupation began. He says: “Although the claim was upon the main line of communication between the Upper and Lower Columbia, and, for military and commercial considerations, an important point, still the progress of settlement aboye the Cascades was so slow, Indian difficulties above so threatening, especially in view of the want of the knowledge of resources subsequently develoq/ed, as to render real estate on the ‘portage of no very great value ; certainly nothing like the value it has subsequently acquired. In my judgment, this is the great highway of the Upper Columbia and its tributaries, and Oregon and Washington Territories. The topographical advantage of the place is its adaptation for transit from the upper to the lower Cascades, and the railroad enhances this advantage. In 1860 I think eighteen thousand dollars would have been a fair remuneration for Johnson’s entire claim.”
The defendants also have produced as witnesses, Hon. James H. D. Henderson and Hon. John B,. McBride, representatives in Congress from Oregon. Neither of these gentlemen professes to have an accurate knowledge of the value of the property in 1856, but the one thinks that $10,000 would have been a “fair price,” and the other, that $50,000 would have been “ a very high price.” Perhaps the facts are best summed up by the Hon. James W. Nesmith in 1856, in command of the territorial troops at the Cascades, and since senator in Congress, when he testifies: “I have heard the place valued at all prices — from $5,000 to $500,000.”
After a careful examination of the evidence, we agree that the value of the occupation, taking into account the fact that the government possessed the privilege of continuing it indefinitely or of terminating it without notice and at any time, was $6,500 per annum, payable annually. For the fraction of a year, between the 30th April, 1863, and the day on which this action was brought, we think the government should not be vexed now, but that it properly belongs to the rent of the current year.
The judgment of the court is, that the claimant recover, for seven years’ occupation of his tract, at the rate of $6,500 per annum, amounting to the sum of $45.500.