Nott, J.,
delivered the opinion of the court:
This case has involved on both sides an immense amount of labor and expense. The evidence has been of the most costly kind, the testimony of experts, and the arguments of the most exhaustive character. The subject-matter of the suit is a patented invention, and the suit has been tried as if it were an action for infringement involving the validity of the patent. The state of the art, the history of the invention, the magnitude of the field of operations, the utility of the device, the saving which will accrue to the defendants, the benefits which have enured or may enure from the use of the invention, even the length, breadth, and commerce of the rivers upon which it has been applied have been the subject of proof and argument.
So far as jurisdiction and damages are involved, the patent-litigation of the Government has developed several classes of cases. First, where the right to use an invention has been acquired by express contract, in which it was early determined that a patent right is property and that the Government has no reserved right to use an invention without compensation (Burns’s Case, 4 C. Cls. R., 113; 12 Wall., 256). Second, cases *537 where in the absence of an express contract the inventor has proffered his device to the proper officers of the Government, and they, with knowledge or notice that it was protected by letters patent, have adopted and used it without procuring a license or agreeing upon the amount of the royalty (McKeever’s Case, 14 C. Cls. R., 396; affirmed 18 id., 757; Palmer’s Case, 128 U. S. R., 262). Third, where the officers of the Government have used an inventor’s device knowing it to be his, but not knowing it to be patented and not supposing that he would seek a royalty (Solomon’s Case, 22 C. Cls. R., 335; Gill’s Case, 25 id., 415). Fourth, where the ordnance officers, in pursuance of the policy of that department, have adopted a device without inquiring as to the right of property in the inventor, but with the intention that if he can substantiate such a right he shall be paid a royalty (Berdan’s Case, ante, p. 48). Fifth, where there has been an unintended use of an invention through the ignorance, carelessness, or mistake of a public officer (Forehand’s Case, 23 id., 477). Sixth, where the officers of the Government at the time of the construction of a public work have expressly disclaimed an intent to use an alleged device, or have denied the validity of a patent or that the work under their charge involves an infringement (Schillinger’s Case, 24 id., 278).
The present case unquestionably belongs to the second class. The inventor proffered his invention to the defendant’s officers; he notified them that it was patented; he named the price at which he would grant licenses or dispose of the entire right. The officers were the proper purchasing agents of the Government, charged with the construction of a public work in which the inventio.il was used; they first learned of the existence of the invention from the inventor; they examined it and adopted it and entered into negotiations for it, and virtually agreed upon the pri.ce to be paid; and, finally, after refusing to enter into an express contract, gave the assurance that if the patent proved to be valid and the invention valuable the inventor should be fairly and justly compensated for its use.
In such a case only two questions can arise — the validity of-the patent and the amount of the damages.' In a sale of personal property one warranty is always implied — that it is the property of the vendor. So in these implied contracts for the sale of patent rights it must be implied that the patentee *538 owned the property, i. e., that tbe invention has been rendered property through the instrumentality oí a valid patent. In the present ease there is no question of novelty or originality or infringement, and consequently the only question is that of damages; what was the property really worth, what is a reasonable royalty to be recovered by the claimant?
In almost every patent case that has come before this court the claimant has sought to establish his damages by the same ■proofs, arguments, and deductions that are usual and proper in actions for infringement; and in almost every case for the use and occupation of real property the claimant has endeavored to recover asñf he were entitled to damages in trespass. In these two classes of cases it is a common thing for the claimant to allege and prove that the defendants used his invention or intruded upon his premises without his license or consent. In actions for the taking of personal property no such misapprehension has occurred, probably because every one has been familiar with the doctrine of the common law that the owner may waive the tort and sue on an implied contract for the proceeds of his goods. The evidence offered has been invariably to show the taking and the value; and the damages sought have been what the property was actually worth. Yet there is no distinction in principle between these different classes of cases, and in this court there has never been a distinction in practice. Since the leading case of Johnson (2 C. Cls. R., 391) it has been uniformly held that the entry of the Government upon real property is never tortious* and that the recovery must be that of an implied rent, such as the owner would have asked and the tenant would have given if the transaction had taken the form of an express contract (Page’s Case, ante). And in ¡latent cases since the leading case of McKeever (14 C. Cls. R., 396; affirmed 18 id., 757) it has likewise been uniformly held that the damages are to be reduced to a reasonable royalty.
In the present case there has been an immense expenditure of time and money to establish on the one side that the Government acquired vast commercial advantages and saved large sums of money and escaped irretrievable losses by virtue of the claimant’s professional advice and the use of his patented invention ; and on the other side that the Government saved little or nothing; that the judgment of its engineers in selecting the claimant’s device was in some instances erroneous, and *539 that a Cheaper device than either the claimant’s or the Cha-ncine, the needle dam, might have befen used, which in all likelihood would have answered just as well. If the Government had taken a man’s horses to draw a train of military supplies it would not be admissible for the owner to measure his damages by showing that the services of the horses were of incalculable value to the Government, saving the stores or relieving the wants of troops in the field. Conversely it would not be admissible for the defendants to show that the quartermaster who impressed the horses erred in judgment; that there was no need of haste; that ox trains would have carried the stores with sufficient speed, and therefore that the owner’s recovery should be limited to the benefit which the Government actually derived from the use of his property, viz, to the value of so many oxen instead of so many horses. On the contrary, no one would have doubted that, the fact to be proved and the question to be answered would be, what was the value of those horses in the local market at the time they were taken?
We come now to the actual question of damages. What was the claimant’s device worth in its market at the time it was taken ? As in many of the other patent cases which have been before the court, the invention at the time of the taking had no market value; it was one likely to be used only by governments on navigable streams, and that rarely. Moreover, it had not then been actually tested in its own limited field. The question is not what experience has shown the invention to be worth, but what it was worth when the Government appropriated it? That question, generally a difficult one in such cases, is here greatly simplified by the acts of the parties.
It appears that Colonel Merrill was the managing and purchasing agent of the Government, and that subject to the approval of his superior officer, the Chief of Engineers, he had as much discretionary power to purchase a license under this patent as to purchase the plank and stone and iron in which it would ultimately be reduced to material form and used in the service of the Government. It likewise appears that the purchase of this right for the Government was a subject of negotiation between Colonel Merrill and the inventor; that the latter at first asked $100 a hurter; that Colonel Merrill flatly refused to give that price; that the negotiation went on by letter, until finally the inventor reduced his price to 15,000 *540 francs to be paid within six months and 30.000 francs payable whenever a dam should be completed. This offer, moreover, was not only in writing, but actually reduced to the satisfactory form of a written agreement, though the written instrument was not executed, and in that specific form Colonel Merrill virtually accepted the offer and agreed to the terms of the proposed contract, subject to the approval of the Chief of Engineers. We say “virtually,” for the acceptance did not take that precise form, yet it was that in substance. If the Chief of Engineers had approved the recommendation of Colonel Merrill an effective and satisfactory express contract would have been entered into by the inventor on the one side and the Government of the United States on the other. Colonel Merrill explicitly, and we think very properly, said in his reply to the proposition:
“ The decision of the Government surprised me as much as it will no doubt surprise you. I found your draft of agreement very reasonable, and I had many hopes of securing its acceptance.”
He had also come immediately to Washington after receiving the proposed agreement to explain to the Chief of Engineers the desirability of the purchase, and he had been, as he says, greatly surprised and disappointed when he found that the Engineer’s Office had determined to adopt the policy of the Ordnance Department, which is to take advantage of all knowledge and of all inventions, and, without denying or admitting the validity of the latter, leave the inventors whose devices have been appropriated free to seek redress without prejudice in a judicial tribunal. (Berdan’s Case, ante.)
We do not decide that the tender of an express contract unaccepted by the other party bound the claimant; we do not decide that the naming of the compensation in that proposed agreement precluded him from seeking a higher one; we do not hold that it became the only evidence of'value which should be considered in such a case; but we are of the opinion that in this case, where the device was new and untried, where not a single sale of the license had been made, where its value in the market at the time rested entirely upon the opinion which Government engineers here and there in four or five countries of the world might set upon it, where the usefulness *541 of every novel element in it was still conjectural, the proposed agreement of the two contracting parties constitutes the best element of market value that the case affords.
In giving effect to this action of the contracting parties we note the fact that the initial payment of 15,000 francs was placed at that amount on the express condition that it should be substantially immediate, and that the deferred payments were placed at 30,000 francs in consideration of the certainty of a binding agreement. On a review of all the facts of the case and taking into 'consideration the variance of the facts from the terms of the proposed agreement, such as the deferred payments, the increased uncertainty of the remuneration, the cost and delay of litigation, we are of the opinion that the parties would have agreed for the use of the invention in the three dams to which it has been applied upon a contingent consideration of deferred payments of about 130,000 francs, and we find the value of the ‘claimant’s royalty, so far as his invention has been appropriated and used, to be $26,000.
The court regrets the heavy expenses which the claimant has borne and the long delay to which he has been subjected, but the value of his device must be estimated as of the time when it was taken and at a price for which it could, then have been sold. '
The judgment of the court is that the claimant recover of the defendants the sum of $26,000.
Scoeield, J., sat in this case and took part in the decision, but was absent when it was announced.